A98A0365. TATTERSALL CLUB CORPORATION v. WHITE.
(501 SE2d 851)

BEASLEY, Judge.

A jury awarded John White compensatory damages and attorney fees against his former employer, Tattersall Club Corporation, because it terminated White in the middle of a one-year written employment contract. The jury also found against Tattersall on its counterclaim that it had overpaid White. Tattersall claims the court erred in denying its motion for judgment notwithstanding the verdict and its motions for new trial, and in entering judgment on the attorney fees claim.

1. The first three enumerations of error focus on the denial of the j.n.o.v. motion and the motions for new trial. In reviewing such, "this Court must determine whether there is any evidence to support the jury's verdict. . . . We must construe the evidence in the light most favorable to the prevailing party to determine whether the elements of [the cause of action] have been proven."[1]

(a) Tattersall contends Robert Kurtz, its general manager and vice president of operations, lacked authority to execute the written employment contract with White. The jury resolved this hotly-disputed issue against Tattersall.

"The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him. . . ."[2] Often referred to as actual or apparent authority, this is a question for the factfinder.[3] "The principal shall be bound by all the acts of his agent within the scope of his authority. . . ."[4]

Evidence supported a finding of actual authority. Kurtz testified Tattersall gave him complete authority to hire and fire employees, including the authority to execute employment contracts. Tattersall hired Kurtz primarily for the purpose of hiring employees to reverse the corporation's failing country club business. Even Tattersall's president Rob Barnett admitted Kurtz had been hired to build a team and to develop and effectuate a business plan, and that hiring White was part of that plan. Kurtz's predecessor in office had executed similar employment contracts, and Kurtz also signed other written contracts, including employment contracts, on behalf of Tattersall. Even managers under him had authority to sign written contracts.

Kurtz as general manager also had apparent authority to execute the contract on Tattersall's behalf. He was on-site and ran the day-to-day operations of the club.[5] Tattersall's president Barnett, who was generally not present at the club, helped Kurtz interview White for the position but allowed Kurtz to be the primary negotiator. General managers in the industry normally have authority to hire and fire employees. For several months Barnett was aware that Kurtz had hired White and did not question it. Barnett even intro-

---

[1] (Citations omitted.) *Ga. Power Co. v. Irvin*, 267 Ga. 760, 762 (1) (482 SE2d 362) (1997); see OCGA §§ 9-11-50; 5-5-21. See generally *Mills v. State*, 188 Ga. 616, 623 (4 SE2d 453) (1939) (trial court may grant new trial in its discretion; appellate court can only review whether law was followed).

[2] OCGA § 10-6-1.

[3] *Thomas Register &c. v. Proto Systems &c.*, 221 Ga. App. 779, 780 (471 SE2d 235) (1996).

[4] OCGA § 10-6-51.

[5] See *Holcomb v. Evans*, 176 Ga. App. 654, 655-657 (1) (337 SE2d 435) (1985) (manager left in charge of premises has apparent authority to act on corporation's behalf).

duced White to the corporation's board as Tattersall's assistant general manager. He did not tell White or Kurtz that Kurtz lacked authority to sign an employment contract for Tattersall. Kurtz specifically told White he had such.

Nevertheless, Tattersall argues that its articles of incorporation and bylaws allowed only Barnett to execute such agreements. These corporate documents are not in the record and were not discussed by any witness. Appellant must show error by the record, not by unsupported assertions in its brief.[6]

Tattersall claims Kurtz marked through Barnett's name and title appearing under the signature line of the agreement and replaced it with his own title, which conclusively demonstrated both Kurtz and White knew Kurtz lacked authority to execute the agreement. Evidence showed the placement of Barnett's name was simply a mistake by White's lawyer in drafting the agreement; both White and Kurtz believed Kurtz had authority to sign.

Tattersall argues the evidence indisputably showed Kurtz and White acted in collusion in creating the agreement. Because both men denied any such collusion, the evidence did not demand the wished-for finding.

Tattersall contends Kurtz, not it, should be held liable on the agreement, but Kurtz signed as "Vice President, Operations, Tattersall Club Corp." and would not be personally liable. Besides, the contract stated it was between Tattersall and White.[7]

(b) Tattersall contends the agreement's indefinite and vague description of White's duties rendered it unenforceable. The agreement provided: "Club hereby employs White as its Membership Coordinator for the development of new memberships at the Horseshoe Bend Country Club located at 2100 Steeple Chase Drive, Roswell, Georgia 30075, which is owned and operated by Club. White's duties shall consist of the following: (a) To market Horseshoe Bend in an attempt to increase the number of new members; (b) To provide a pro forma statement which projects the annual revenues and expenses associated with the development of new memberships; and (c) To render advice and opinions to Club management regarding the development of new memberships and the maintenance of existing memberships. White shall have the autonomy to work such hours and at such places as he deems best suited to the pursuit of his business hereunder."

---

[6] *CNL Ins. America v. Moreland*, 226 Ga. App. 57 (485 SE2d 515) (1997).

[7] Compare *Whitfield v. Broadview Plaza Ltd.*, 161 Ga. App. 248 (288 SE2d 313) (1982) (instrument neither named entity represented nor showed representative was signing in representative capacity).

The phrase "market Horseshoe Bend" is not "absolutely meaningless." "Market" means to sell or to expose for sale.[8] The explanatory clause, "in an attempt to increase the number of new members," immediately follows the phrase in the contract. The agreement obligates Tattersall to facilitate White's marketing efforts by assisting in performing research, placing advertisements, preparing and mailing letters and fliers, and conducting telephone surveys. It also requires Tattersall to reimburse White for dining and entertainment expenses in recruiting potential new members.

The cases cited by Tattersall all concerned employment contracts that were either completely silent as to the services to be performed[9] or only described the duties as "such as shall be assigned to him."[10] In addition to marketing, Tattersall ignores White's duties to provide a pro forma statement and to render advice and opinions, both of which duties he performed.

Phrases similar to "market Horseshoe Bend" have been held sufficiently definite. *McLean v. Continental Wingate Co.*[11] held that the phrase "promote the interest" of the employer in overseeing operations and developing new properties and the term "net proceeds" were not too vague. *McLean* emphasized, "it is well-settled that the policy of the law is against the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract was made to determine the reasonable intention of the parties."[12] If ambiguous, "[t]he meaning ascribed to technical or business terms used in such contracts may be supplied by parol."[13] Moreover, "part performance of the contract is sufficient to validate an otherwise vague and objectionable document, provided that the part performance itself relates to the contested clause."[14]

White testified he was to market Horseshoe Bend by selling memberships and increasing revenues. He promoted memberships through business contacts developed at the Atlanta Chamber of Com-

---

[8] Webster's Third New Intl. Dictionary, p. 1383.

[9] *McTerry v. Free For All &c.*, 129 Ga. App. 724 (200 SE2d 915) (1973) ("no description").

[10] *Weill v. Brown*, 197 Ga. 328, 329 (29 SE2d 54) (1944); see *Farr v. Barnes Freight Lines*, 97 Ga. App. 36, 37 (1) (101 SE2d 906) (1958) ("to do all work required of him").

[11] 212 Ga. App. 356, 357-359 (442 SE2d 276) (1994).

[12] (Citations and punctuation omitted.) 212 Ga. App. at 358 (1); see *Touche Ross & Co. v. DASD Corp.*, 162 Ga. App. 438, 439-440 (1) (292 SE2d 84) (1982) (phrase "complete the computer programming and testing" of a "System Design" was not indefinite).

[13] *Touche Ross*, supra, 162 Ga. App. at 440 (1); see *Gram Corp. v. Wilkinson*, 210 Ga. App. 680, 681 (1) (437 SE2d 341) (1993) (parol evidence considered in construing employment contract).

[14] *Touche Ross*, supra, 162 Ga. App. at 440 (2); see *Pine Valley Apartments, Ltd. v. First State Bank*, 143 Ga. App. 242, 245 (237 SE2d 716) (1977) ("A contract which is originally and inherently too indefinite may later acquire precision and become enforceable by virtue of the subsequent acts, words, or conduct of the parties") (citation and punctuation omitted).

merce, the North Fulton Chamber of Commerce, and other business communities; he encouraged real estate agents who handled properties in neighboring residential communities to let their prospects know of the club; he attended functions of the Japan American Society and promoted the club to new businessmen moving to Atlanta; he wrote an article on golf in Georgia for the Japan American Society Quarterly magazine; he conducted receptions for prospective members; he sent out mailings of brochures promoting the club; he played golf with, gave tours to, and dined with prospective members; he made video presentations at reception booths; and he gave advice on the club's business plans. Spending 50 to 60 hours per week in these activities, he helped produce 70 to 80 memberships during his six-month tenure, resulting in a net increase of $387,000 in club revenues over the previous year.

(c) In a related argument, Tattersall contends the agreement lacked mutuality because White's duties were undefined. "A contract is unilateral in the sense that renders it invalid when one party to it is bound and the other is not, or when one party gets something and the other nothing. While a promise of another is a good consideration for a promise, the promise in each instance must be of such a character as to be capable of enforcement against the party making it, as otherwise neither party will be bound. It must be sufficiently definite both as to time and subject-matter. Unless the promises are of such character, the contract based solely on consideration thereof is unilateral and not binding. The test of mutuality is to be applied as of the time the contract is to be enforced; and if the promisee accomplishes the object contemplated, then the promise is rendered valid and binding."[15]

As stated above, White's duties were sufficiently definite to be enforceable. Moreover, part performance of the contract supplied any missing mutuality.[16] Tattersall's argument that it did not know of the agreement ignores that its fully-authorized representative Kurtz negotiated, executed, and performed the agreement.

(d) Claiming the court erred in denying its motion for new trial solely on the counterclaim, Tattersall argues that post verdict inter-

---

[15] (Citations and punctuation omitted.) *McMurray v. Bateman*, 221 Ga. 240, 250-251 (1) (144 SE2d 345) (1965).

[16] See *Spalding v. Southeastern Personnel of Atlanta*, 222 Ga. 339, 342 (1) (149 SE2d 794) (1966) (agreement allowing employer to deem in its sole judgment whether employee had breached was enforceable after part performance); *McMurray*, supra, 221 Ga. at 251 ("if there had originally been a lack of mutuality in its provisions, the deficiency would have been supplied by performance"); *Roberson v. Eichholz*, 218 Ga. App. 511, 513 (2) (462 SE2d 382) (1995) (partial performance "furnished the consideration and mutuality for the original agreement, even if such agreement at its inception had been nudum pactum") (citation omitted).

views with the jurors indicated the "purported" written contract prejudiced the jurors against Tattersall's counterclaim. Not only was the contract genuine, but vaguely referring to unsworn jury interviews not found in the record is completely futile and entirely disingenuous. Even sworn affidavits from jurors placed in the record will not be considered to impeach the verdict.[17]

(e) In a vacuous effort to gain a new trial on all claims, Tattersall complains "[t]he jury, full of lay, sympathetic working class citizens, bought [White's evidence of an agreement]." Nothing in the record supports this description of the jury it participated in selecting. But the fact that the jury believed White's evidence over its evidence is perfectly within the bounds of its competence, as a jury.[18]

2. Tattersall claims the court erred in allowing attorney fees to be awarded. OCGA § 13-6-11 authorizes such an award "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. . . ." This, too, "is a question for the jury and an award will be upheld if there is any evidence to support it. [Cit.]"[19]

"Bad faith warranting an award of attorney fees must have arisen out of the transaction on which the cause of action is predicated. It may be found in defendant's carrying out the provisions of the contract, that is, in how defendant acted in his dealing with the plaintiff. Bad faith other than mere refusal to pay a just debt is sufficient, provided it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. So defendants can be held liable for attorney fees if they committed the breach in bad faith."[20]

Denying an employee compensation due under a contract and forcing him to sue to recover what he earned establishes the bad faith necessary to authorize attorney fees.[21] Second, an "interested motive" sufficient to award attorney fees is present where, even though plaintiff performed as requested by defendant, defendant refuses to pay because it disliked the result and decided to blame plaintiff.[22] Third, evidence of dishonesty in the business transaction will support an attorney fees award.[23]

An interested or sinister motive is evident in that Tattersall not

---

[17] OCGA § 9-10-9; *Consolidated American Ins. Co. v. Spears*, 218 Ga. App. 478, 479-480 (1) (462 SE2d 160) (1995).

[18] *Service Merchandise v. Jackson*, 221 Ga. App. 897, 899 (1) (473 SE2d 209) (1996).

[19] *Duffy Street S.R.O. v. Mobley*, 266 Ga. 849, 850 (4) (471 SE2d 507) (1996).

[20] (Citations and punctuation omitted.) *Young v. A. L. Anthony Grading Co.*, 225 Ga. App. 592, 593 (484 SE2d 318) (1997).

[21] *Southern Water Technologies v. Kile*, 224 Ga. App. 717, 720 (3) (481 SE2d 826) (1997).

[22] *Young*, supra, 225 Ga. App. at 593-594.

[23] *Shepherd v. Aaron Rents*, 208 Ga. App. 139, 143-144 (4) (430 SE2d 67) (1993).

only expressed no dissatisfaction with White's performance under the contract, but its president described him as having done a "pretty good job." The club received significantly increased revenues and memberships as a result of White's work. Inferable as the true motive was that as a result of a falling out between Kurtz and Barnett, Barnett desired to escalate the undoing of Kurtz by not only firing Kurtz but also firing the man he had hired, regardless of the latter's performance or the terms of his contract. Also inferable is that Barnett considered White a convenient scapegoat to help compensate for Barnett's perceived mistake in hiring Kurtz and allowing him to run the business inefficiently.

Evidence also showed there was no bona fide controversy about White's entitlement to receive payment under the contract. Absent a bona fide controversy, "that is, where there is no genuine dispute regarding the liability," a jury may find stubborn litigiousness or unnecessary trouble and expense.[24] Because the evidence was overwhelming Kurtz had the actual as well as the apparent authority to execute the contract, and because Barnett admitted he knew of no way White could have known Kurtz lacked such authority, and because the terms of the contract were clearly definite, White's admittedly satisfactory performance would support a finding there was no question of liability.

*Judgment affirmed. Pope, P. J., and Ruffin, J., concur.*

DECIDED APRIL 17, 1998.

*Weener & Mason, Philip H. Weener, William P. Mason*, for appellant.

*Bird & Associates, Wendell R. Bird, Jeffrey L. Pombert*, for appellee.

---

[24] (Citation omitted.) *Cade v. Roberts*, 175 Ga. App. 800, 801 (334 SE2d 379) (1985).