A99A0162, A99A0163. BELL et al. v. SASSER et al.; and vice versa.
(520 SE2d 287)

RUFFIN, Judge.
In October 1991, Robert Sasser became president of Carolina Skiff, Inc., a company that manufactures boats in Waycross. Due to management disagreements, Sasser left Carolina Skiff in August 1992. In 1993, he and his son, John Sasser, started their own boat manufacturing company called Sundance Boats, Inc. (Sundance). The Sassers were the only stockholders in Sundance.

In late 1993, Seaborn W. Bell began negotiating with the Sassers about acquiring an interest in Sundance. The parties eventually entered into an agreement for the sale of the business, under which Bell would pay the Sassers $200,000 for all of the stock of Sundance (100 shares). Following the closing, Robert Sasser resumed the presidency of Carolina Skiff. Although Sundance apparently remains in business, it was not turning a profit as of late 1995.

In August 1995, Bell and Sundance filed a six-count complaint against Robert Sasser, John Sasser, and Carolina Skiff. Count 1 of the complaint sought to recover the $200,000 purchase price, alleging that the Sassers sold Bell unregistered securities in violation of Georgia law. Count 4 alleged that Robert Sasser fraudulently misrepre-

<hr>

sented to Bell that he would personally take care of any warranty work required on Sundance boats manufactured prior to the purchase, and Count 5 alleged that Robert Sasser and Carolina Skiff conspired to drive Sundance out of business.[1]

The parties filed cross-motions for partial summary judgment as to Count 1 of the complaint. In addition, the defendants filed a motion for summary judgment on the remaining counts. The trial court granted summary judgment in favor of the defendants on all claims except Counts 4 and 5. In Case No. A99A0162, Bell and Sundance appeal the entry of summary judgment against them on Count 1. In Case No. A99A0163, the Sassers and Carolina Skiff appeal the trial court's failure to grant summary judgment in their favor on Counts 4 and 5. For reasons that follow, we affirm in part and reverse in part.

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c); see also *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). We review the grant or denial of a motion for summary judgment de novo, construing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmovant. *McDuffie v. Argroves*, 230 Ga. App. 723, 724 (1) (497 SE2d 5) (1998). "[A] grant of summary judgment must be affirmed if it is right for any reason." *Bob v. Hardy*, 222 Ga. App. 550, 551 (1) (474 SE2d 658) (1996).

### Case No. A99A0162

1. At the closing of the Sundance purchase, the Sassers endorsed and notarized the backs of their stock certificates. The portion of the certificates indicating the transferee was left blank. However, blanks were filled in indicating that the Sassers "do hereby irrevocably constitute and appoint Seaborn W. Bell Attorney to transfer the said Shares on the books of [Sundance] with full power of substitution in the premises." The Sundance stock was not registered in accordance with the Georgia Securities Act of 1933.

After the sale, five individuals in addition to Bell invested in Sundance. The day after closing, Bell convened a meeting of the investors. New stock certificates numbered "3" through "9," totaling 400 shares, were issued to the investors, including Bell. The original stock certificates numbered "1" and "2" that Bell received from the Sassers were not transferred and apparently were retired.

Bell argues that the Sassers' sale of unregistered stock to him violated the Georgia Securities Act and that the Sassers are required

---

[1] Counts 2, 3, and 6 are not at issue on appeal.

to repurchase the shares at the price Bell paid for them. The trial court ruled in favor of the Sassers, finding that the Georgia Securities Act did not apply to the Sundance sale transaction and that even if it did, Bell himself had violated the Act, precluding recovery. We disagree.

As a threshold matter, we find that the shares of Sundance stock were "securities" within the meaning of the Act. In *Cohen v. William Goldberg & Co.*, 262 Ga. 606, 607 (1) (423 SE2d 231) (1992), our Supreme Court ruled that the initial inquiry for determining whether stock should be treated as securities is the "stock characterization" test set forth by the United States Supreme Court in *Landreth Timber Co. v. Landreth*, 471 U. S. 681 (105 SC 2297, 85 LE2d 692) (1985). Under that test,

> when an instrument is both called "stock" and bears stock's usual characteristics, a purchaser justifiably may assume that the federal securities laws apply. Those characteristics usually associated with common stock are (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value.

(Citations and punctuation omitted.) *Cohen*, supra. If, and only if, the stock does not satisfy these criteria, then the next inquiry is whether the stock otherwise qualifies as a security under OCGA § 10-5-2 (16). Id. at 608-609. The appropriate analysis for this determination is the "economic reality" test set forth in *Securities Exchange Commission v. W. J. Howey Co.*, 328 U. S. 293 (66 SC 1100, 90 LE 1244) (1946). *Cohen*, supra at 609. Under the economic reality test, a transaction constitutes a securities transaction if there is (1) an investment; (2) a reasonable expectation of profits; and (3) reliance on the management of another party to create the profits. Id. at 607.

In this case, the instruments in question are, on their face, certificates of shares in the Sundance corporation. Accordingly, the starting point for determining whether this stock constitutes securities under Georgia law is whether it bears the characteristics usually associated with stock. *Cohen*, supra; *Landreth*, supra at 686. The trial court, however, concluded that this case is "difficult, if not impossible, to analyze under the *Landreth* stock characterization test" and therefore skipped directly to the *Howey* economic reality test.[2] The court cited *Huggins v. Chapin*, 227 Ga. App. 340, 341 (1)

---

[2] Applying the economic reality test, the court found that the sale of Sundance was not

(489 SE2d 109) (1997), in which this Court applied the economic reality test, rather than the stock characterization test, to determine whether the sale of an interest in a closely held corporation constituted a securities transaction under Georgia law. In *Huggins*, the investor contributed $50,000 to Huggins in exchange for a ten percent interest in Huggins' closely held corporation. Id. at 340. Apparently, no stock certificates were ever issued or transferred to the investor, although five months later, the parties executed a document explaining that the contribution represented a ten percent ownership interest in the company. Id. at 340-341. Based on these facts, we determined that the stock characterization analysis was not workable because the investment occurred long before the parties executed the document outlining its terms. Id. at 341 (1).

The situation presented here is quite different from that in *Huggins*. The parties executed an agreement for the sale of all outstanding Sundance stock, and on the day of closing the sellers endorsed their stock certificates, giving Bell power of attorney to transfer the shares on the books of the corporation. As in *Cohen* and *Landreth*, the transaction clearly involved stock, and thus the stock characterization test applies. See *Cohen*, supra at 609-610 (2); *Landreth*, supra at 683-684.

Applying the stock characterization test, we conclude that the shares of Sundance stock were securities within the meaning of Georgia law.[3] First, the Sundance stockholders were entitled to receive dividends when profits were apportioned. Under Georgia law, the articles of incorporation must authorize at least one class of shares entitled to receive the net assets of the company upon dissolution. OCGA § 14-2-601 (b) (2). As Sundance's articles of incorporation do not create separate classes of shares, then, by law, all shares must be entitled to participate in asset distribution. Second, the Sundance stock was negotiable, as evidenced by the Sassers' sale of their shares to Bell. Moreover, Sundance's by-laws expressly contemplate such transfers. Third, we find no evidence indicating that the Sundance shares could not be pledged or hypothecated. Fourth, Sundance's by-laws expressly provide that stockholders are entitled to one vote for each share of stock standing in their name. Finally, the Sundance stock apparently has the capacity to increase in value, as Bell and the Sassers negotiated a purchase price for it. We therefore find that the Sundance stock meets the stock characterization test and is sub-

---

a securities transaction because Bell was not relying on the management efforts of others to turn a profit.

[3] We note that the Sassers do not argue that, under the stock characterization analysis, the Sundance shares were not securities. Rather, the Sassers claim that the trial court correctly utilized the economic reality test.

ject to the Georgia Securities Act. *Cohen*, supra at 610.

The Georgia Securities Act makes it unlawful to sell or offer for sale an unregistered security. OCGA § 10-5-5 (a); *DeBoard v. Schulhofer*, 156 Ga. App. 158, 159 (1) (273 SE2d 907) (1980). A buyer of unregistered securities has a civil remedy against the seller for the purchase price of the security, "upon the tender, where practicable, of the security at any time before the entry of judgment, or for damages if he no longer owns the security." OCGA § 10-5-14 (a). See *Utzman v. Caribbean &c. Dev. Corp.*, 107 Ga. App. 56, 57-59 (129 SE2d 62) (1962) (decided under former law). The Sassers argue that Bell is not entitled to this remedy for four reasons, all of which we reject.

First, the Sassers contend that Bell lacks standing to sue them under the Georgia Securities Act because he was not a purchaser of the Sundance stock. Only a person who actually purchases unregistered securities may sue under OCGA § 10-5-14 (a). *Mack v. Smith*, 178 Ga. App. 652, 653 (4) (344 SE2d 474) (1986) (offeree who did not purchase securities lacked standing). A purchaser

> refers to the one to whom the sale or disposition is made. . . . The word purchaser may be used in a broad sense to include those who acquire title for a monetary consideration[;] however, as commonly employed and as ordinarily used . . . a purchaser is understood to be one who obtains through negotiation or the like, for a consideration. . . . Certainly, since a sale includes a disposition . . ., it would seem to be a logical interpretation to include one to whom the disposition is made within the class of persons on whom the right of voiding illegal sales or dispositions is conferred.

(Punctuation omitted.) *Utzman*, supra at 58. The Sassers assert that Bell was merely designated as attorney for the transfer, but was not actually a purchaser. The Sassers are correct that these are two distinct roles:

> The assignment and the power of attorney are two separate things. The former operates to vest in the assignee the rights of the assignor as against everybody but the corporation. The power of attorney is an authorization to the corporation to recognize the assignment of said rights.

(Punctuation omitted.) *Peoples Bank v. Jones*, 193 Ga. 720, 725 (20 SE2d 74) (1942). What the Sassers overlook, however, is that Bell was *both* attorney for the transfer *and* transferee of the stock. The agreement for the sale of the business expressly contemplated that Bell would buy the Sundance stock from the Sassers. The Sassers do not dispute the fact that they endorsed their stock certificates and

gave them to Bell at the closing. That the blank space on the stock certificates for "transferee" was never filled in does not alter the reality of the transaction — that the Sassers sold and Bell purchased all of the outstanding stock. Bell was a purchaser, and he has standing to sue the Sassers under OCGA § 10-5-14 (a).

Second, the Sassers contend that the Sundance stock was exempt from the registration requirements of OCGA § 10-5-5. The Sassers rely on the following exemption set forth in OCGA § 10-5-9 (12):

> Any transaction involving the issuance or transfer of securities of the issuer by the issuer . . . to a corporation or its shareholders . . . in connection with a merger, . . . consolidation, reclassification of securities, or sale or transfer of corporate, trust, or partnership assets in consideration of the issuance or transfer of such securities, where the transaction must be approved by the [vote of the shareholders of the corporation].

By its plain terms, that exemption has no applicability here, where the stock in question was sold to an individual and not a corporation. That Bell later transferred some of the Sundance stock to new investors is of no import because the relevant time period for determining whether the stock had to be registered is the time it was offered for sale, not *after* the sale. See OCGA §  10-5-5 (a).

Third, the Sassers maintain that Bell cannot recover because his role as attorney for the transfer of the Sundance stock certificates renders him equally guilty of violating the Georgia securities laws. The Sassers cite *Nash v. Jones*, 224 Ga. 372, 373-374 (162 SE2d 392) (1968), in which the Supreme Court ruled that a purchaser of securities could not void the sale on the ground that the securities were unregistered where the purchaser also served as an officer and director of the corporation when it sold the stock. Along with sellers of unregistered securities, the Georgia Securities Act imposes joint and several liability on the general partners, executive officers, and directors of such sellers. OCGA § 10-5-14 (c). Construing an earlier version of this Code section, the Court concluded in *Nash* that, as officer and director of the selling corporation, the purchaser was equally guilty of violating the Georgia Securities Act and therefore was not entitled to recovery. *Nash*, supra at 375. Thus, "where the plaintiff seeking to avoid a sale of securities stands in a dual capacity, as purchaser and as a member of the category of persons liable to the purchaser," the equitable defense of in pari delicto precludes recovery. *Fierer v. Ashe*, 142 Ga. App. 290, 292 (3) (235 SE2d 598) (1977).

This principle does not apply here. At the time of the sale, Bell

did not serve as an officer or director of Sundance, or in any other capacity that could render him jointly and severally liable for Sundance's sale of unregistered securities. Bell merely was given power of attorney to record the transfer of stock on the books of the corporation. Whether Bell became an officer or director of Sundance *after* the sale does not matter, because the relevant time period is when the securities were sold to him. *Nash,* supra at 374. Thus, the trial court erred in granting summary judgment in favor of the Sassers on this ground.

Finally, the Sassers assert that Bell has not made a legally sufficient tender of the stock certificates. To qualify for the repurchase remedy, a purchaser must "tender . . . the security at any time before the entry of judgment." OCGA § 10-5-14 (a). The amount of recovery allowed to a purchaser who has tendered the security is "the consideration paid in cash . . . for the security with interest thereon . . . (less the amount of any income received thereon). . . ." Id. If the purchaser no longer owns the security, then he may recover damages in an amount "which equals the difference between the fair value of the consideration which the buyer gave for the security and the fair value of the security at the time the buyer disposed of it." Id.

We find that Bell has satisfied the tender requirement. Bell tendered to the trial court two certificates issued in his name for, respectively, seventy-five shares and twenty-five shares of Sundance stock. The Sassers contend that this tender was invalid because Bell did not submit the original certificates numbered "1" and "2" and endorsed by the Sassers, but instead submitted certificates numbered "3" and "9" which were issued to him after the sale. While Bell has not tendered the very securities that he purchased from the Sassers, he has nevertheless tendered 100 shares of Sundance stock, which is what he bought from them. Bell was not required to tender the original stock certificates. See *Rushing v. Williams*, 125 Ga. App. 601, 602 (1) (188 SE2d 437) (1972) (contemplating that plaintiff who had lost securities could satisfy tender requirement by obtaining a re-issue of them).

The Sassers also assert that Bell is not entitled to a repurchase because Sundance's issuance of additional shares of stock to new investors following the sale diluted the value of the 100 shares tendered by Bell. Nothing in OCGA § 10-5-14 restricts this recovery to purchasers who have not resold any of their stock. Nevertheless, we agree with the Sassers that the post-sale investments in Sundance may have altered the value of the company's stock, resulting in "income" to Bell and complicating the calculation of the recovery to which he is entitled. See generally *Randall v. Loftsgaarden*, 478 U. S. 647 (106 SC 3143, 92 LE2d 525) (1986) (discussing appropriate

recovery for defrauded investors under analogous federal law).[4] As the record and the briefs are poorly developed on this point, however, we decline to decide this issue on appeal. See *Grove v. Sugar Hill Investment Assoc.*, 219 Ga. App. 781, 787 (4) (466 SE2d 901) (1995) (summary judgment inappropriate on poorly developed record).

In sum, the undisputed facts show that the Sassers are liable to Bell under OCGA § 10-5-14 (a) for the sale of unregistered securities, but the amount of recovery to which Bell is entitled remains in dispute. Thus, summary judgment on this claim was not appropriate. Accordingly, we affirm the trial court's denial of Bell's motion for summary judgment on Count 1 of the complaint and reverse the trial court's grant of the Sassers' motion for summary judgment on that count.

### Case No. A99A0163

2. Robert Sasser claims that the trial court erred in denying his motion for summary judgment on the claim of Bell and Sundance that Sasser fraudulently misrepresented that he would pay any warranty claims arising from sales of Sundance boats before the sale of the business. Prior to the sale, Sundance provided a two-year warranty guaranteeing repair or replacement of a defective hull. Bell testified that the issue of who would be responsible for paying warranty claims arose during his final negotiations with Sasser over the sale. According to Bell, Sasser said:

> Well, there shouldn't be any [warranty problem], but if there's more than two or something, I'll handle it. . . . You know, if it's just a little minor thing, then that's just a part of the business expense, but if it's a major thing, I'll handle it. . . . I'll handle it with you. We'll work it out. . . . If two boats come back, [Sundance] handles it. If it gets to be a major problem, then we need to talk about it.

Sasser denied that warranties were ever discussed during the sale negotiations. Although the written purchase agreement does not mention warranties specifically, it does provide as follows:

> Buyer has taken possession of the business as of April 25, 1994, and at closing adjustments shall be made as to what existing invoices were outstanding and as to what bank accounts were available. *All expenses up to April 25, 1994,*

---

[4] We note that even if Bell had not properly tendered the stock, he still would be entitled to the alternative damages remedy prescribed in OCGA § 10-5-14 (a).

*will be paid from the existing Sundance Boats, Inc. bank account and any excess in that bank account shall be paid to Seller and any shortage shall be made up by the seller.*

(Emphasis supplied.) After the sale, Bell billed Sasser for pre-sale warranty claims, but Sasser refused to pay.

Sasser argues first that Bell's own testimony shows that Sasser made no definite promise to pay warranty claims, but only a promise to discuss the issue further if any such claims were made. As discussed below, Bell's testimony is relevant only insofar as it sheds light on the parties' written agreement of sale — the source of Sasser's alleged obligation to pay. That testimony can be construed as evidence of an agreement between the parties that Sundance would pay the first two warranty claims and Sasser would be responsible for any additional claims.[5] Moreover, the sales agreement provides that expenses incurred prior to the date that Bell took over the company would be paid out of Sundance's bank account, with the Sassers making up any shortfall. Contrary to Sasser's assertions, we find that this agreement is not so vague or indefinite as to be unenforceable. See *Tattersall Club v. White*, 232 Ga. App. 307, 309-311 (1) (b) (501 SE2d 851) (1998). As for Sasser's testimony that there was no such agreement, "it is the function of the jury, not the appellate court, to resolve conflicts in the testimony and determine the credibility of the witnesses." (Punctuation omitted.) *Williams v. State*, 221 Ga. App. 296, 298 (4) (471 SE2d 258) (1996).

Sasser also contends that his alleged promise to pay warranty claims is unenforceable because it is not in writing as required by the Statute of Frauds. As Bell points out, however, the source of the alleged promise is not Sasser's oral statements, but the provision in the written sales agreement described above. Although that provision does not specifically enumerate warranty claims as one of the expenses for which the Sassers will be responsible, Bell's above-quoted testimony constitutes evidence that the parties intended the inclusion of warranty claims. Sasser argues that Bell's testimony is inadmissible parol evidence because the parties' obligations were reduced to a written contract. However, it is well settled that parol evidence is admissible to explain ambiguities in contractual language. OCGA § 24-6-3 (b); *Alpha Beta Dickerson Southeastern v. White Co.*, 235 Ga. App. 273, 275 (1) (509 SE2d 351) (1998). "Ambiguity in a contract may be defined as duplicity, indistinctness, an

---

[5] Although pleaded as a fraud claim, this claim appears in actuality to be one for breach of contract, and the parties treat it as a contract claim in their arguments on appeal. Accordingly, we will analyze it as such. See *Manning v. Robertson*, 223 Ga. App. 139, 142 (2) (476 SE2d 889) (1996) (courts look to substance and not nomenclature of pleadings).

uncertainty of meaning or expression." (Punctuation omitted.) Id. at 274. Here, the term "all expenses up to April 25, 1994" is ambiguous in that it is not clear whether this includes expenses incurred but not yet billed as of April 25, and whether it encompasses warranty claims. See *Gram Corp. v. Wilkinson*, 210 Ga. App. 680, 681 (1) (437 SE2d 341) (1993) (term "office manager" in employment contract was ambiguous because it did not specify the duties associated with the position). Parol evidence is thus admissible to explain this ambiguity. There is a conflict in the parol evidence as to whether Sasser agreed to pay warranty claims, and it is the jury's function to resolve that conflict. *Alpha Beta*, supra at 276. Accordingly, the trial court properly denied Sasser's motion for summary judgment on this claim.

3. Robert Sasser and Carolina Skiff also contend that they were entitled to summary judgment on the claim that they conspired to put Sundance out of business. They maintain that there was no evidence of conspiracy. We agree.

"A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." (Punctuation omitted.) *U. S. Anchor Mfg. v. Rule Indus.*, 264 Ga. 295, 297 (1) (443 SE2d 833) (1994). The cause of action for civil conspiracy lies not in the conspiracy itself, but in the underlying tort committed against the plaintiff and the resulting damage. *Savannah College of Art &c. v. School of Visual Arts &c.*, 219 Ga. App. 296, 297 (464 SE2d 895) (1995). In this case, the conspiracy count of the complaint did not allege any specific tortious behavior on the part of Sasser and Carolina Skiff, but the trial court ruled that the evidence was sufficient to create a jury question as to whether the defendants "have tortiously interfered with Sundance's business relationships and operations." A claim of tortious interference with business relations requires proof that Sasser and Carolina Skiff — acting improperly, without privilege, and with intent to injure — induced a third party or parties not to enter into or continue a business relationship with Sundance. *La Petite Academy v. Prescott*, 234 Ga. App. 32, 33 (1) (506 SE2d 183) (1998).

Bell testified that the conspiracy claim was based on (1) Sasser's resumption of the presidency of Carolina Skiff after the sale of Sundance; (2) Carolina Skiff's threats to file an allegedly baseless patent infringement lawsuit against Sundance; and (3) letters sent by Carolina Skiff to two or three Sundance customers accusing Sundance of patent infringement. Bell further testified that, as a result of the "threatening letter," "[s]ome of the dealers just quit doing business with us" because they "didn't want to be involved." We find this evidence insufficient to raise an issue of fact as to whether the defendants wrongfully induced customers not to do business with Sundance.

First, the letters from Carolina Skiff to Sundance and Sundance's customers were sent *before* Sasser resumed the presidency of Carolina Skiff. Sasser testified that he was not involved in sending the letters. Bell presented no direct evidence of any involvement by Sasser and no circumstantial evidence from which a jury could infer such involvement. Thus, the letters are not evidence of any conspiracy. Second, Bell presented no evidence that the patent infringement lawsuit that Carolina Skiff allegedly threatened to file was not pursued in good faith. In fact, Bell testified that he did not even know what was covered by Carolina Skiff's patent. Because the undertaking of a legally privileged act — such as filing a lawsuit to vindicate one's rights — cannot support a tortious interference claim, Bell was required to present evidence that the threatened litigation was, at the very least, unfounded. See *Ray v. Atkins*, 205 Ga. App. 85, 90 (3) (421 SE2d 317) (1992). This he failed to do. Third, the mere fact that Sasser became the president of Carolina Skiff does not suggest any wrongful conduct toward Bell on the part of Sasser, Carolina Skiff, or both acting jointly.

Because Bell failed to carry his summary judgment burden of coming forward with evidence to support his conspiracy claim, the trial court improperly denied summary judgment to Sasser and Carolina Skiff on that claim.

*Judgment affirmed in part and reversed in part. McMurray, P. J., and Andrews, P. J., concur.*

DECIDED JULY 7, 1999 — CERT. APPLIED FOR.

*Gibson & Spivey, Douglas L. Gibson*, for appellants.
*Dillard, Bower & East, Terry A. Dillard, Scott C. Crowley, J. B. McGee, Jr.*, for appellees.