A06A0248. NATIONWIDE MORTGAGE SERVICES, INC.
v. TROY LANGLEY CONSTRUCTION COMPANY, INC.

(634 SE2d 502)

ADAMS, Judge.

Troy Langley Construction Company, Inc. filed suit against Nationwide Mortgage Services, Inc., inter alia,[1] to recover payment for demolition services performed on property owned by Nationwide. Nationwide counterclaimed, asserting that it had never authorized the demolition work and seeking to recover the value of the demolished property. Nationwide appeals from the trial court's order granting summary judgment on that counterclaim.

This Court conducts a de novo review of the trial court's grant of summary judgment, construing the evidence in the light most favorable to Nationwide, as the nonmovant. *Progressive Cas. Ins. Co. v. Evans*, 276 Ga. App. 594 (623 SE2d 767) (2005). Viewed in that light, the evidence shows that Nationwide is in the business of rehabilitating commercial properties and making real estate loans. Mike Roberts is the president of the company, and Theodore Jockisch is the vice president. Roberts and Jockisch are Nationwide's only officers and sole shareholders. Nationwide owned property located at 2000 Perry Boulevard in Atlanta, which it acquired through foreclosure proceedings. Nationwide did not possess clear title, however, as there was an outstanding first mortgage on the property held by individual investors. At the time of Nationwide's acquisition, the property included 17 buildings containing approximately 136 apartment units.

On June 6, 2000, Nationwide entered into a lease purchase agreement to sell the property to VentureCap Development, Inc. The lease purchase agreement was signed by Steven Boyd as president of VentureCap and by Roberts as president of Nationwide. VentureCap planned to demolish the existing structures on the property and construct new buildings. To that end, VentureCap obtained a demolition permit for the property on or about August 3, 2000. The permit listed VentureCap as the owner of the property. By its own terms, this permit expired if no demolition work had begun on or before February 3, 2001. VentureCap did not begin demolition of the property during the permit period, because it was unable to obtain funding.

When it became apparent that VentureCap would not be able to finance the project alone, Boyd, Jockisch and Roberts began to discuss alternate plans for developing the property. The parties determined that a partnership between VentureCap and a company

---

[1] Langley also named as defendants VentureCap Development, Inc.; Steven Boyd d/b/a VentureCap Development Corporation; Ted Jockisch, individually and d/b/a Perry Limited, LLC; Mike Roberts, individually and d/b/a Perry Limited, LLC; and Bradford Chase Luxury Townhomes.

owned by Jockisch and Roberts might provide an effective vehicle for obtaining financing. In discussing how to develop the property, Jockisch and Roberts considered both the option of renovating the existing structures and the option of new construction on the property.

Following those discussions, on February 23, 2001, VentureCap entered into a partnership agreement with Perry Limited, LLC, "to engage in the acquisition and the development, construction, and sale of the planned units to be located at [2000 Perry Boulevard] and to be known as 'Bradford Chase Luxury Townhomes.'" Jockisch and Roberts each signed the agreement as a "Partner in Perry Limited." But the two never formed "Perry Limited, LLC," although they reserved the name through the office of the Secretary of State. Nationwide was not a named party to the agreement.

The partnership agreement provided that VentureCap's initial capital contribution would be to take responsibility for negotiating the loan structure for the project. Perry Limited's contribution was to be the "multi-unit residential real property located at" 2000 Perry Boulevard. The agreement named VentureCap as the primary managing partner for the project and Perry Limited as the secondary managing partner.

Jockisch stated that this partnership agreement was signed in order to explore the option of constructing new luxury townhomes on the property, and he acknowledged that such new construction would require demolishing the existing buildings. But both Jockisch and Roberts testified that the partnership was strictly intended as a vehicle to aid VentureCap in securing funding and they understood that the partnership would not go into effect — and the development of the property as luxury townhomes would not occur — until the financing was in place. Boyd, on the other hand, believed that the partnership agreement, along with his continuing discussions with Jockisch, authorized him to proceed with the development plans.

Subsequently, on or about April 24, 2001, VentureCap and Langley entered into a contract for the demolition of the existing structures at 2000 Perry Boulevard. The contract listed VentureCap as the owner of the property, and Boyd as the owner's agent. But neither VentureCap, Perry Limited nor the Bradford Chase partnership owned the property at that time and, in fact, never acquired ownership.

Nevertheless, relying upon the original August 3, 2000 demolition permit, listing VentureCap as the property owner, Langley proceeded with demolition of the existing structures, completing the work on July 10, 2001. Throughout this process, Langley's principals continued to believe that VentureCap owned the property. Accordingly, at no time before, during or after the demolition process, did

Langley obtain permission or authorization from Nationwide to perform the work. And Boyd admitted that Nationwide, the owner of title, never directly authorized VentureCap to enter into the contract for demolition.

Jockisch and Roberts assert that they were unaware that VentureCap had entered into this contract with Langley, and only discovered after the fact, when Jockisch drove by the property in the summer of 2001, that demolition had been substantially completed. Jockisch testified that he had never even heard of Langley until he learned that the company had filed a lien against the property for the work performed.

But Boyd testified that Jockisch knew that the old buildings were going to be torn down to make way for the new construction contemplated by the partnership agreement. He said that he told Jockisch that he was going to have the buildings demolished prior to signing the contract with Langley. Boyd also testified that Jockisch, Roberts and perhaps even their attorney,[2] were on the site while Langley was working on the demolition. And Michael T. Riley, the architect hired by VentureCap to provide architectural and engineering services for the redevelopment of 2000 Perry Boulevard, stated that he held discussions with Jockisch regarding the new construction plans before, during and after the demolition occurred on the property.

Once again, VentureCap was unable to procure funding to pay for the demolition, and Langley placed a lien on the property in August 2001. Langley later initiated this lawsuit seeking payment for the demolition work,[3] and Nationwide counterclaimed. In granting Langley's motion for summary judgment on the counterclaim, the trial court found that VentureCap, as the primary managing partner, had the authority under the partnership agreement with Perry Limited, LLC to contract for the demolition on the property. Nationwide appeals this order on a number of grounds.

Nationwide first contends that the trial court erred in granting summary judgment because it was not a party to the partnership agreement. Moreover, it asserts that neither VentureCap, Perry Limited nor the Bradford Chase partnership owned the property, and thus had no authority to authorize the demolition work. Nationwide argues that even if the partnership agreement authorized VentureCap to contract for the demolition of the property, Nationwide, which

---

[2] The attorney submitted an affidavit, however, stating that he had been on the building site on one occasion and at that time, the buildings were still standing.

[3] The record indicates, however, that subsequently on December 18, 2002, Langley entered into a demolition contract with the City of Atlanta to perform demolition work at 2000 Perry Boulevard under a Community Block Development Grant Program. The City paid Langley $262,000 for the demolition it had previously completed in July 2001.

owned the property, did not provide such authorization. Finally, Nationwide contends that issues of fact precluded the grant of Langley's motion for summary judgment on the ground of estoppel.

As an initial matter, we agree with Nationwide that it is not directly bound by the terms of that agreement. Jockisch and Roberts did not execute the agreement in their capacity as officers of Nationwide. Rather, they purported to sign the document on behalf of "Perry Limited, LLC," an entity which does not exist.[4] By signing in that fashion, Jockisch and Roberts became personally obligated under the partnership agreement. "An undertaking by an individual in a fictitious or trade name is the obligation of the individual." (Citations and punctuation omitted.) *Hawkins v. Turner*, 166 Ga. App. 50, 51 (1) (303 SE2d 164) (1983). See also *Pinson v. Hartsfield Intl. Commerce Center*, 191 Ga. App. 459, 461 (382 SE2d 136) (1989); OCGA § 14-2-204.

Jockisch and Roberts, therefore, were parties to that agreement, but Nationwide was not. Nationwide has its own legal identity distinct from Jockisch and Roberts:

> The corporate identity is entirely separate from the identity of its officers and stockholders. A corporation and even its sole owner are two separate and distinct persons. One person may own all the stock of a corporation, and still such individual shareholder and the corporation would, in law, be two separate and distinct persons.

(Footnote omitted.) *Jerry Dickerson Presents, Inc. v. Concert/Southern Chastain Promotions*, 260 Ga. App. 316, 326 (2) (c) (579 SE2d 761) (2003). And a corporation is not generally bound by the acts of its officers undertaken in their private capacities. See *Whitfield v. Broadview Plaza Ltd.*, 161 Ga. App. 248, 250 (2) (288 SE2d 313) (1982). Thus, Nationwide was not directly bound by the provisions of the partnership agreement. See *Engineered Builders v. Lamar Nash Buick-Pontiac*, 133 Ga. App. 141, 142 (1) (210 SE2d 179) (1974).

But the partnership agreement is still relevant in determining whether VentureCap had authority to enter into the demolition

---

[4] Contrary to Nationwide's arguments, this fact does not invalidate the partnership agreement. The agreement provided that the partnership was automatically dissolved by the dissolution of one of the corporate partners. Nationwide argues that this language must be interpreted as requiring the corporate existence of Perry Limited as a prerequisite to the partnership's formation. Because Perry Limited never existed as a corporation, Nationwide argues that the partnership was never formed. But an unformed corporation does not equate with a dissolved corporation. That Perry Limited was never formed simply means that it was never a corporate partner. Rather, Jockisch and Roberts were partners in their individual capacities, and the cited provision has no application in this case.

contract with Langley. Although Nationwide contends that the partnership agreement was intended strictly to aid in securing financing for developing the property, by its own terms, the partnership agreement had a much broader scope. Its stated purpose was "to engage in the acquisition and the development, construction, and sale" of luxury townhome units.

VentureCap was named the primary managing partner and Perry Limited the secondary managing partner to accomplish those ends. As a general rule, a partner has the power to bind a partnership by entering into contracts in pursuit of the partnership's business, "unless the partner so acting has in fact no authority to act for the partnership in the particular matter." OCGA § 14-8-9 (1). See also *Tara Apts., Ltd. v. C & S Nat. Bank*, 149 Ga. App. 577, 578 (254 SE2d 897) (1979). Nationwide cites to nothing in the language of the partnership agreement that would limit VentureCap's power to enter into a contract with Langley, so long as that contract was in furtherance of partnership business. While the agreement does list certain actions that require unanimous agreement of all partners before they can be undertaken, that list does not include entering into contracts for demolition, construction or other related work. Accordingly, the language of the partnership agreement gave VentureCap the ostensible authority to enter into such contracts on behalf of the partnership.

But Nationwide asserts that despite the language of the agreement, VentureCap had no authority to enter into the demolition contract with Langley because neither the partnership nor its two named partners ever acquired ownership of the property. Jockisch and Roberts both pledged the property as their capital contribution under the partnership agreement. Though they did not own the property in their individual capacities, as the sole owners and officers of Nationwide, they arguably had apparent authority to make good on that pledge,[5] subject to Nationwide's obligation to satisfy the first mortgage on the property.

Nationwide contends, however, that any transfer of the property to the partnership was contingent upon securing funding to pay off that mortgage. While the partnership agreement does not expressly include such a condition, and, in fact, makes no mention of the mortgage, Nationwide relies upon the language from the agreement addressing subsequent capital contributions to support its argument. The pertinent section reads:

---

[5] See generally *Holliday Constr. Co. v. Sandy Springs Assoc.*, 198 Ga. App. 20 (1) (400 SE2d 380) (1990).

**2.2 Subsequent Capital Contributions.** The property will be funded per the budget and draw schedule which will be approved by the parties and SunTrust Bank (hereinafter "the Bank") financing the development.

Nationwide asserts that this language demonstrates that the parties intended to finance the acquisition of 2000 Perry Boulevard.

At the outset, construing this language is an issue of law for the court. *McCollum v. O'Dell*, 241 Ga. App. 6, 9 (2) (525 SE2d 721) (1999). And we must first look to the language of the document to determine the parties' intent. Id.

If the contract language is ambiguous, however, then the court must apply the applicable rules of construction. The cardinal rule of contract construction is to ascertain the intention of the parties. If, after applying the rules of construction, the language remains ambiguous, then the finder of fact must resolve the ambiguity.

(Punctuation and footnotes omitted.) Id. After applying the rules of construction, we find that the language of the partnership agreement is ambiguous. The agreement states that Jockisch and Roberts will provide the real property at 2000 Perry Boulevard as its initial capital contribution, without any conditions. It then addresses budget and draw schedules in connection with "subsequent" capital contributions. It is unclear from this language whether the initial capital contribution would be funded as outlined in Section 2.2 above or whether the budget and draw schedule applied only to subsequent capital contributions. It is also unclear whether establishing a budget and draw schedule with SunTrust Bank was a prerequisite for Perry Limited's making its initial capital contribution. Applying the rules of construction to this language does not remove these ambiguities, and thus parol evidence will be necessary to resolve the issue of whether VentureCap had the requisite authority over the property to contract for the demolition work. *Bell v. Sasser*, 238 Ga. App. 843, 852 (2) (520 SE2d 287) (1999). Accordingly, we find that this issue presents a question of fact for a jury.

Moreover, we find that issues of fact exist as to whether Nationwide, based upon its own actions, is estopped from denying Venture-Cap's authority to contract for demolition services on the property. See generally *R. W. Holdco, Inc. v. Johnson*, 267 Ga. App. 859, 869 (5), 871 (7) (601 SE2d 177) (2004); *Multi-Media Holdings v. Piedmont Center, 15 LLC*, 262 Ga. App. 283, 285 (1) (583 SE2d 262) (2003) ("A presumption of ratification can arise from slight acts of confirmation, or from mere silence or acquiescence, or where the principal receives

and holds the fruits of the agent's act[s]."") (citation and punctuation omitted); *Rains v. Dolphin Mtg. Corp.*, 241 Ga. App. 611, 614 (4) (525 SE2d 370) (1999) ("Ratification may occur if a business entity accepts the benefits of an act done by another on its behalf, although that person had no actual or apparent authority to act for the business.") (footnote omitted).

Though the partnership was signed by Jockisch and Roberts individually, the execution of that document must be considered in context. The initial transaction in this matter involved a lease purchase agreement between Nationwide and VentureCap. At the time, Jockisch testified that Nationwide was paying the investors holding the first mortgage on the property approximately 11 percent on their money. Nationwide wanted to sell the property quickly to avoid this continuing obligation, but when the lease purchase fell through, Jockisch and Roberts determined that it was in the company's interest to pursue other options for the property. Because Nationwide could not sell the property outright, it considered developing the property in order to pay off the first mortgage and make additional income as a developer. Thus, the formation of the partnership arose out of discussions between Boyd, representing VentureCap, and Jockisch and Roberts, acting on behalf of Nationwide's interests.

In connection with that partnership, Jockisch and Roberts allowed VentureCap to take steps, including pursuing public and commercial financing, in furtherance of the Bradford Chase project, which Jockisch, at least, understood would require the demolition of the existing structures on the property. Jockisch had a number of discussions with Boyd regarding his efforts, and Boyd provided him with documentation regarding his plans for the project. Jockisch also participated in meetings with the architect VentureCap hired to design the townhome development. Jockisch testified that he attended meetings not as a partner with VentureCap, but rather as a representative of Nationwide. He said that he gave the architect his Nationwide business card at the meetings. Moreover, there was disputed evidence that Jockisch and Roberts had visited the site during the demolition process and took no action to halt the process. While Nationwide denies that its officers were aware of VentureCap's plans to demolish the property until the process was completed, the evidence shows that Nationwide continued to work with Boyd to develop the property even after learning of the demolition. Moreover, for approximately one year — until Langley filed its complaint — Nationwide took no action to seek recovery or redress for its demolished property. We find that this evidence presents a factual issue as to whether Nationwide acquiesced in and/or later ratified VentureCap's actions in contracting with Langley.

Accordingly, issues of fact remain as to whether VentureCap had authority to contract for the demolition work on the property, and we reverse the trial court's grant of summary judgment to Langley.

*Judgment reversed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED JULY 14, 2006.

*Joseph D. Buccellato, Edward J. Bauer, Kennon Peebles, Jr.*, for appellant.

*Shapiro Fussell, Nicholas S. Papleacos, David C. Moulds*, for appellee.

