A04A1601, A04A1680. PARK REGENCY PARTNERS, L.P. v. GRUBER
et al.; and vice versa.
(608 SE2d 667)

PHIPPS, Judge.

Morton M. Gruber and Ellen J. Gruber executed a purchase and sale agreement with Park Regency Partners, L.P. (Park Regency) the developer of a condominium project known as "Park Regency, a Condominium." Nearly two years later, the Grubers filed a breach of contract action against Park Regency, alleging that the documents

---

they had signed violated the Georgia Condominium Act[1] and so rendered the purchase and sale agreement void, or in the alternative, voidable. The trial court found that the Grubers' claims lacked merit and granted summary judgment to Park Regency but denied Park Regency's post-judgment motion to add a counterclaim against the Grubers for attorney fees. Park Regency appealed that judgment. The trial court, however, dismissed Park Regency's appeal as a result of Park Regency's failure to timely pay the costs as required by statute. In Case No. A04A1601, Park Regency appeals the trial court's dismissal of its appeal. In Case No. A04A1680, the Grubers challenge the trial court's denial of their motion for summary judgment and the grant of summary judgment to Park Regency. Finding no error in either case, we affirm.

The following facts are not controverted. On September 14, 1999, the Grubers executed a purchase and sale agreement with Park Regency that specified a total purchase price of $482,800, which included $474,800 for one residential unit designated as Unit 1108 and $8,000 for two parking units to be chosen later. The Grubers submitted an earnest money letter of credit for $48,280 to Park Regency. Park Regency provided the Grubers with a disclosure package that purported to comply with the statutory disclosure requirements. The purchase and sale agreement obligated Park Regency to complete construction within two years of the date of the agreement's execution.

As executed, the agreement did not specify or identify the parking units being purchased by the Grubers because the layout of the garage had not yet been finalized, making the selection of parking units impractical. Paragraph 1 (a) (ii) of the agreement noted that Exhibit D depicted the "preliminary floor plan of the garage and location of the Parking Unit(s)." Paragraph 1 (a) (ii) continued by stating:

> Purchaser understands and agrees that selection of the specific parking unit(s) being purchased hereunder cannot be made until finalization of the floor plan and layout for the garage ("Final Garage Plan"). Seller shall notify Purchaser when the Final Garage Plan is available and when it is Purchaser's turn ("Selection Priority Number") to select the specific Parking Unit(s) being acquired hereunder. Purchaser is hereby assigned the Selection Priority Number identified on Schedule A.

[1] OCGA § 44-3-70 et seq.

Schedule A designated the Grubers' selection priority number as 17. The Grubers were provided the preliminary floor plan for the parking garage.

On June 19, 2001, Park Regency notified the Grubers that their condominium unit would be completed on or before July 25, 2001, and asked them to set a closing date. The Grubers did not do so. On July 11, 2001, Park Regency asked the Grubers to select their parking units based on the final parking garage plan. The Grubers then selected parking units P3-26 and P3-27 and faxed their choices to Park Regency.

Shortly after indicating their parking unit selections, by letters dated August 7, 2001, and August 15, 2001, the Grubers notified Park Regency of their intent to rescind the purchase agreement and requested the return of their letter of credit. In the August 7 letter, the Grubers notified Park Regency that they were invoking Paragraph 5 (c) to rescind and cancel the purchase agreement.[2] In the August 15 letter, the Grubers outlined a different basis for rescinding the transaction — that Park Regency had made material changes to the declaration between the time of the execution of the purchase agreement and the date on which the declaration was recorded. Park Regency reminded the Grubers that under Paragraph 20, it had authority to make certain changes to the declaration and urged them to comply with the terms of the agreement. When the Grubers did not select a date for closing, Park Regency set a date and when the Grubers failed to appear for the closing, Park Regency sent notice of their default to them.

After Park Regency refused to refund their earnest money, the Grubers filed suit. The Grubers alleged that the purchase and sale agreement was void because it lacked an adequate legal description of the parking units. They also claimed that the recorded declaration was legally insufficient because it failed to assign a specific percentage of undivided interest in the common elements, failed to allocate a vote to each parking unit, and failed to allocate to each parking unit a share of the liability for common expenses as required by OCGA §§ 44-3-77 through 44-3-80. In the alternative, the Grubers claimed that the purchase agreement was voidable due to certain breaches of disclosure requirements and due to material alterations in the disclosure documents.

---

[2] Paragraph 5 (c) provided the Grubers with a right to rescind and cancel the agreement in the event that the units and common elements were not completed within two years of the date the agreement was executed. Two years had not elapsed from September 14, 1999, so this right had not yet ripened.

Park Regency and the Grubers both sought summary judgment. The trial court granted Park Regency's motion and denied the Grubers' motion. After the entry of summary judgment, Park Regency filed a motion for leave to add a counterclaim for attorney fees under OCGA §§ 9-11-13 (e) and 9-11-15 (d). The trial court denied Park Regency's motion, and Park Regency filed a notice of appeal of that ruling. The Grubers then filed a notice of cross-appeal. Thereafter, the Grubers timely paid their bill of costs while Park Regency did not. After Park Regency failed to pay its bill of costs within 20 days as required by OCGA § 5-6-48 (c), the Grubers filed a motion to dismiss Park Regency's appeal.

At the evidentiary hearing on the Grubers' motion to dismiss, Park Regency conceded that it had not paid the costs within 20 days. Although it admitted that a "bill of costs was sent by the Clerk of the Superior Court," Park Regency pointed out that the bill "simply was addressed to the firm; it was not addressed to any attorney," and was therefore improperly addressed. Park Regency offered as its sole witness John Hutchins, its lead counsel. Hutchins testified that "[t]he first time I realized that the bill of costs had been issued was when we received Mr. Gruber's motion [to dismiss]." Hutchins admitted that when the superior court's website was checked, the docket reflected the unpaid bill of costs which the law firm then immediately paid. Hutchins testified that "[w]e know it came to the firm, it was signed for, and then we don't know what happened to it after that point." Hutchins explained that the firm's normal procedure "for improperly addressed mail" is for that item to go "to our head receptionist who sends out an e-mail identifying the mail in whatever way it can be identified, usually with a case name or file, and says: [t]his mail needs to be claimed and then the lawyer who is involved in the case will claim the mail and take whatever action's necessary." Admitting that "the firm's standard practice, for some unknown reason, broke down," Hutchins conceded that "[t]his was something that fell through [the] cracks." Asserting that "in the grand scheme of things this was an excusable mistake," Park Regency asked the court to deny the motion to dismiss.

Subsequent to the hearing, in a detailed order, the trial court rejected Park Regency's arguments. In an order dismissing Park Regency's appeal, the trial court entered detailed findings. It found that the clerk had sent the cost bills to each party on March 21, 2003, by certified mail, return receipt requested. The court found that the Grubers received the bill for their cross-appeal on or about March 25, 2003, and that Park Regency received its bill on or about March 27, 2003. The court noted that the Grubers had paid their cost bill on March 27, 2003, but that Park Regency did not pay its bill until May 13, 2003, after the Grubers filed their motion to dismiss. The trial

court expressly found that Park Regency's failure to timely pay the cost bill delayed the transmission of the case to this court and further found that "such failure to pay the cost bill was both unreasonable and inexcusable." While dismissing Park Regency's appeal, the trial court directed that the Grubers' appeal remain pending and be unaffected by that dismissal.

## Case No. A04A1601

1. Park Regency contends that the trial court abused its discretion in dismissing its appeal. Asserting that the trial court's grant of the motion to dismiss was a "blatant abuse of its discretion," Park Regency claims that under the circumstances, its failure to pay the costs bill was neither unreasonable nor inexcusable.

Under OCGA § 5-6-48 (c), the trial court may dismiss an appeal, after notice and an opportunity for a hearing, "where there has been an unreasonable delay in the transmission of the record to the appellate court, and it is seen that the delay was inexcusable and was caused by the failure of a party to pay costs in the trial court or file an affidavit of indigence." A trial court's decision to grant or deny a motion to dismiss an appeal under OCGA § 5-6-48 (c) is reviewed under an abuse of discretion standard.[3] When making factual determinations based upon evidence presented at a hearing on the question of dismissal, the trial court "is vested with a broad discretion" to decide whether the appeal should be dismissed.[4] Absent an abuse of such discretion, the court's decision will not be disturbed on appeal.[5]

This court has previously found that a delay of more than 30 days in paying costs is prima facie unreasonable and inexcusable.[6] The presumption that arises in such circumstances is, however, not conclusive and "is subject to rebuttal if the party comes forward with evidence to show that the delay was neither unreasonable nor inexcusable."[7]

Here, the delay in paying costs was 47 days. At the hearing, Park Regency attempted to rebut the prima facie presumption that the delay was unreasonable and inexcusable. Although it admitted that the law firm's internal procedures had not functioned properly, Park Regency failed to offer any explanation to justify or explain the

---

[3] *Battaglia v. Duke*, 230 Ga. App. 667, 669 (1) (497 SE2d 250) (1998).

[4] *Leonard v. Ognio*, 201 Ga. App. 260, 261 (410 SE2d 814) (1991).

[5] Id.

[6] See *Bouldin v. Parker*, 173 Ga. App. 526, 527 (327 SE2d 760) (1985).

[7] (Citation omitted.) *Brandenburg v. All-Fleet Refinishing*, 252 Ga. App. 40, 44 (6) (555 SE2d 508) (2001).

malfunction.[8] Now in this appeal, despite conceding that the firm's internal "mystery mail" procedure "failed for some unknown reason," Park Regency continues to blame the clerk for not addressing the mail to the attorney of record. Even assuming arguendo that the bill should have been specifically directed to the attorney of record, the return receipt for the certified mailing that was filed in the clerk's office on March 28, 2003, indicates that the law firm received the mail on March 27, 2003, and the face of the return receipt reflects the correct civil action file number in clear, legible writing.

The trial court found that the bill of costs was sent to Park Regency, received by Park Regency's counsel, and that "47 days had elapsed since receiving the cost bill from the Clerk of Court" without payment being made. The trial court's written findings have record support; therefore, we cannot say that the court abused its broad discretion in dismissing the appeal.[9]

2. Park Regency asserts that the trial court erred by failing to make the necessary findings to support the dismissal of its appeal. Park Regency claims that its failure to pay costs was not shown to be wilful and did not cause a delay in the appellate process. Notwithstanding Park Regency's claim to the contrary, the failure to pay costs need not be the result of wilfulness because even the existence of good faith does not automatically excuse an unreasonable delay.[10] In determining whether the delaying party's conduct is inexcusable, the trial court examines the totality of circumstances, including whether the negligence of the appealing party caused an unreasonable delay, whether such delay reasonably should have been detected and timely corrected, and whether such negligence prejudiced the opposing party.[11] The record here shows that the trial court conducted an evidentiary hearing, then made the requisite factual findings that the delay was caused by the failure of Park Regency to pay costs which caused a delay in transmitting the record to this court that was both unreasonable and inexcusable. In these circumstances, we cannot say that the trial court abused its broad discretion in dismissing the appeal.[12]

---

[8] See *Bouldin*, supra, 173 Ga. App. at 527.

[9] See *Wood v. Notte*, 238 Ga. App. 748, 749 (1) (519 SE2d 923) (1999).

[10] *Jackson v. Beech Aircraft Corp.*, 217 Ga. App. 498, 500 (458 SE2d 377) (1995).

[11] Id.

[12] See *McCorvey Dev. v. D. G. Jenkins Dev. Corp.*, 260 Ga. App. 276, 277 (581 SE2d 308) (2003).

*Case No. A04A1680*

In separate claims of error and on different grounds, the Grubers contend that the purchase and sale agreement was voidable, or in the alternative, that it was void.

3. The Grubers assert that the evidence and the law mandate a finding that the purchase agreement was voidable because it violated certain provisions of the Georgia Condominium Act (hereinafter the Act).

(a) The Grubers contend that by electing to create "parking units" as separate parcels of real property intended for individual ownership, Park Regency became obligated to comply with the Act's provisions relating to the sale of such units. They complain that Park Regency failed to assign the parking units a percentage interest in the common elements in violation of OCGA §§ 44-3-77 (a) (7) and 44-3-78 (a). In addition, the Grubers assert that Park Regency failed to assign the parking units a vote in violation of OCGA §§ 44-3-77 (a) (8) and 44-3-79 (a).

The Grubers are correct that the Act requires a recorded declaration to contain certain information including the allocation of interests in the common elements to units and the allocation of votes in the condominium association. Both OCGA §§ 44-3-78 and 44-3-79 afford a range of options and methods by which these allocations may be accomplished. As to the allocation of interests in the common elements, subsection (a) of OCGA § 44-3-78 states in pertinent part: "[s]uch allocation may be by percentage, fraction, formula, or any other method which indicates the relative undivided interests in the common elements." Similarly, as to the allocation of votes in the association, subsection (a) of OCGA § 44-3-79 provides in applicable part: "[t]he allocation of such votes may be by percentage, fraction, formula, or any other method which indicates the relative voting power allocated to each unit."

Contrary to the Grubers' argument, however, the declaration accomplished the requisite allocations by combining the parking units with the residential units for purposes of allocating interests in the common elements and also with respect to voting rights. Specifically, Paragraph 5 (b) (ii) of the declaration as recorded stated:

Undivided interests in the Common Elements attributable to Parking Units shall be deemed to be included in the undivided interests in the Common Elements allocated to each Residential Unit as set forth in Exhibit "C" hereto, and the undivided interest in the Common Elements allocated to each Residential Unit shall not be affected by the number of Parking Units owned.

Paragraph 7 allocated the votes to the various units and stated in pertinent part, "each Owner shall be entitled to one (1) vote for each Residential Unit or Service Unit in which he or she holds the interest required for membership, which vote shall be appurtenant to such Residential Unit or Service Unit, as the case may be." With respect to the voting rights allocated to parking units, Paragraph 7 of the declaration stated, "[a]ll votes for Parking Units shall be included in the votes attributable to Residential Units, and votes attributable to Residential Units shall not be affected by the number of Parking Units owned, as more fully set forth in the By-Laws." Paragraph 8, entitled ALLOCATION OF LIABILITY FOR COMMON EXPENSES, provided in part:

> The liability for Common Expenses attributable to Parking Units shall be deemed to be included in the liability for Common Expenses allocated to the Residential Units as set forth in Exhibit "C" herein and the liability for Common Expenses allocated to Residential Units shall not be affected by the number of Parking Units owned.

The Grubers fail to cite, and we have not found, any provision in the Act that requires parking units to have voting rights or to have an interest in the common elements that is independent of or separate from the rights and interests of residential units or service units. Therefore, we cannot say that this particular method of allocating the voting rights and interests in the common elements violated the Act.

(b) The Grubers contend that Park Regency breached the statutory disclosure requirements by failing to reveal the method for allocating common expenses or other liabilities to the parking units. They claim that the budget showed that the association intended to include as income an estimated $250 per parking unit per year for a total of $70,000. They assert that Park Regency had no legal basis for this charge. They claim that although Paragraph 8 (d) of the declaration gave the authority to the condominium board "to levy rental charges and/or fees upon the Owners of Parking Units as deemed necessary in the discretion of the Board," the $250 charge cannot be considered rent or a fee. They contend that the board cannot charge owners of the parking units "rent" for what is individually owned, and they argue that the $250 charge did not fit within the Act's definition of "fee."

Paragraph 8 (d) of the declaration authorized the board to exercise discretion in charging fees against the owners of parking units. According to Park Regency, the charge at issue was intended to defray the cost of maintenance of the parking deck. Park Regency

claims that because the owners of parking units benefit dispropor- tionately from the maintenance of the parking deck, it was reason- able and fair to charge special fees to the owners of such units. We agree. Charging a special fee to owners of parking units did not offend the Act because OCGA § 44-3-80 (b) (1) authorizes condominium instruments to use special assessments to allocate equitably those common expenses that benefit some but not all units.

(c) The Grubers contend that Park Regency made material alterations in the disclosure documents during the construction period and thereby made the purchase agreement voidable. The Grubers complain about "material changes" that include: (1) the expansion of Park Regency's rights by lengthening the time Park Regency could veto amendments to the condominium documents; (2) the expansion of the rights of the association in Section 9 (a) by adding the right to enter the private residential units without the owner's permission to perform maintenance and to clean the exterior of the building; and (3) the alteration of Section 15 (p) of the declaration pertaining to hard surface flooring so that owners desiring to replace old or worn floor tile must seek the association's approval.

Without deciding whether any of the changes at issue were, in fact, material, we note that OCGA § 44-3-111 (d) does not foreclose a developer from making certain material changes in the disclosure documents when a purchaser has expressly consented in writing that the developer may do so. OCGA § 44-3-111 (d) states:

> The items required to be furnished or made available to a prospective buyer under this Code section shall constitute a part of each covered contract; and no change may be made in any of such items which would materially affect the rights of the prospective buyer or the value of the unit without the approval of the prospective buyer except to the extent that such items by their own terms, by the express terms of such covered contract, or by the provisions of this article may be changed without the consent of any unit owner or prospec- tive buyer.

Paragraph 20 of the purchase and sale agreement, the covered contract at issue, expressly authorized Park Regency to make limited changes, to wit:

> Prior to Recording, Seller reserves the right to make any changes to any of said items without the Purchaser's con- sent, except for any changes affecting the Purchaser's per- centage ownership of the Common Elements; provided, how- ever, Seller shall make no changes which modify the Drawings

except as provided in paragraph 5 (a) hereof.

Thus, in executing the agreement, the Grubers acknowledged Park Regency's limited right to make certain changes to the documents without their consent, prior to the recordation of the declaration in its final form.

(d) The Grubers claim that Park Regency violated their rights by changing the relative voting power of each unit by altering the total number of units in the complex. They argue that a change in the relative voting power is, by statute and legislative intent, a material change to the disclosure documents that affected their rights and so violated the Act. They contend that Park Regency impermissibly changed their voting power by reducing the number of condominium units from 150 to 143, thereby violating OCGA § 44-3-93 (c), which generally disallows changing "the number of votes in the association" without the express consent of the unit owners.

The Grubers' argument mistakenly relies upon OCGA § 44-3-93 (c), which pertains to amendments to condominium instruments. The Act defines "condominium instruments" as "the declaration and plats and plans recorded pursuant to this article."[13] So, by definition, a declaration does not become an "instrument" until it is recorded. Before a declaration is recorded, OCGA § 44-3-111 applies to the transaction, not OCGA § 44-3-93 (c). OCGA § 44-3-111 sets forth the information that sellers are required to furnish buyers as well as the rights of buyers generally. Under Paragraph 20 of the covered contract, Park Regency retained the right to modify the total number of units that it built. In any event, it is difficult to see any harm to the Grubers because each unit still had but one vote, the voting power of each unit had not been changed, and the relative voting power of each unit had actually increased to 1/143 instead of 1/150.

(e) The Grubers claim that Park Regency's right to modify the terms of the agreement makes the contract unilateral and lacking in mutuality. They argue that allowing Park Regency a right to make changes to the declaration without obtaining their consent, destroyed the mutuality of the agreement.

The Grubers' argument misperceives the meaning of unilateral.

A contract is unilateral in the sense that renders it invalid when one party to it is bound and the other is not, or when one party gets something and the other nothing. While a promise of another is a good consideration for a promise, the promise in each instance must be of such a character as to be

---

[13] OCGA § 44-3-71 (8).

capable of enforcement against the party making it, as otherwise neither party will be bound. It must be sufficiently definite both as to time and subject-matter. Unless the promises are of such character, the contract based solely on consideration thereof is unilateral and not binding. The test of mutuality is to be applied as of the time the contract is to be enforced; and if the promisee accomplishes the object contemplated, then the promise is rendered valid and binding.[14]

The contract at issue here was not unilateral or lacking in mutuality.[15] Within the two-year time limit for completing construction, Park Regency had accomplished the construction as contemplated by the agreement. When Park Regency sought to enforce the Grubers' obligations, it had already fulfilled its own obligations.

4. (a) The Grubers claim that the evidence and the law mandate a finding that the purchase agreement was void for failure to adequately describe the real property to be conveyed. They contend that by electing to create parking units as separate parcels of real property intended for individual ownership and intended to be freely transferrable, Park Regency was required to provide a proper legal description of those units, and its failure to do so rendered the agreement void.

Real property that is subject to a sale must be sufficiently described in a contract of sale to indicate "the grantor's intention to sell a particular lot of land."[16] In order to constitute a binding obligation on a promisor, the Statute of Frauds requires that "[a]ny contract *for sale of lands, or any interest in, or concerning lands,*" must be in writing and signed by the party to be charged.[17] Here, the obligation at issue was the sale of two unspecified parking units which constituted an interest in land or concerning lands.

Ordinarily, OCGA § 44-3-73 would foreclose most challenges to the sufficiency of legal descriptions. It states:

After the submission of any property to this article, no description of a condominium unit located thereon shall be deemed vague, uncertain, or otherwise insufficient if it sets

---

[14] (Punctuation and footnote omitted.) *Tattersall Club Corp. v. White*, 232 Ga. App. 307, 311 (1) (c) (501 SE2d 851) (1998).

[15] See, e.g., *Greenwald v. Columbus Bank & Trust Co.*, 228 Ga. App. 527, 529 (492 SE2d 248) (1997) (upholding contractual provisions in a guaranty where one party authorized the other to make unilateral alterations to extend and renew their agreement); *Dunlap v. C & S DeKalb Bank*, 134 Ga. App. 893, 896 (4) (216 SE2d 651) (1975).

[16] (Citations and punctuation omitted.) *Marsh v. Baird*, 203 Ga. 819 (2) (48 SE2d 529) (1948).

[17] (Emphasis supplied.) OCGA § 13-5-30 (4).

forth the identifying number of that unit, the name of the condominium, the name of the county or counties in which the condominium is located, and the deed book and page number where the first page of the declaration is recorded. Any such description shall be deemed to include the undivided interest in the common elements appertaining to such unit even if such interest is not stated or referred to in the description.

The section applies to a "condominium unit" defined in the Act as "a portion of the condominium intended for any type of independent ownership and use."[18]

The application of this section here would create an incongruous result. The purchase agreement would be enforceable as to the residential unit but unenforceable as to the parking units. This is nonsensical. Georgia law does not require a perfect description of the property provided that the contract is sufficiently definite to identify the sale of the land to be conveyed.[19] While a perfect description is not required, the contract must furnish the key to identifying the land intended to be conveyed.[20] "A description will fail if it is so indefinite that no particular tract of land is pointed out, but even a vague description will suffice if by competent parol evidence its precise location is capable of ascertainment and its identity can thus be established."[21]

When the parties executed the purchase and sale agreement, Park Regency provided the Grubers with a copy of the plans for the parking garage. Later, after finishing the construction of the parking garage, Park Regency provided the Grubers with an updated set of plans from which to select their parking units. The Grubers then selected units P3-26 and P3-27. Regardless of whether the agreement was enforceable prior to the Grubers' selection of those two specific parking units, after Park Regency built the parking units and the Grubers notified Park Regency of their choices, any issue of the adequacy of the legal description of the parking units under the Statute of Frauds became moot. The Statute of Frauds does not extend to situations "[w]here there has been performance on one side, accepted by the other in accordance with the contract."[22] Here, after accepting the Grubers' deposit that included a down payment on the

---

[18] OCGA § 44-3-71 (28).

[19] See *Cochran v. Teasley*, 239 Ga. 289, 291 (1) (236 SE2d 635) (1977).

[20] *Swan Kang, Inc. v. Tae Sang Kang*, 243 Ga. App. 684, 688 (3) (534 SE2d 145) (2000).

[21] (Punctuation and footnote omitted.) Id.

[22] OCGA § 13-5-31 (2).

two parking units, Park Regency then built the specified condominium unit, the two parking units, and the common areas. The Grubers make no claim that Park Regency did not fully perform all obligations on its side of the contract.

(b) The Grubers point out that after they indicated their preferences for the two parking units, Park Regency never committed itself to convey the parcels they had selected. They assert that Park Regency never indicated in writing that those two units remained available for purchase or that they would be conveyed to the Grubers. The Grubers contend that because the contracting parties did not agree to all essential terms, the agreement was not a final and binding contract. They argue that before Park Regency accepted their offer in writing or otherwise, by their August 2001 letters, they had revoked their offer to purchase the parking units.

The Grubers' argument overlooks two points. First, the Grubers gave their consent to accept a selection priority number that would establish the order in which they would select their parking units. In addition, the Grubers agreed that upon completion of the parking garage, but before closing, they would select their parking units. The record shows without dispute that the Grubers chose their parking units after the completion of the parking garage and according to their "selection" number. Accordingly, we find that the parties entered a binding and enforceable contract and that, under the terms of that contract, the Grubers were obligated to purchase from Park Regency: a residential condominium unit and two parking units, together with a percentage interest in the common elements.

(c) The argument that the agreement was void as being a nonbinding obligation subject to unilateral changes was considered and rejected in Division 3 (e).

(d) The Grubers contend that the invalid portion of the agreement pertaining to the parking units was such an integral part of the agreement that its invalidity destroys the remainder of the agreement.[23] In light of our holding that the purchase and sale agreement was a valid and enforceable contract, this argument is moot.

*Judgments affirmed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED NOVEMBER 3, 2004 —
RECONSIDERATION DENIED DECEMBER 15, 2004.

*McKenna, Long & Aldridge, John P. Hutchins, James A. Washburn, Larry D. Floyd, Jr., Christopher A. Wiech*, for appellant.

---

[23] But see *Horne v. Drachman*, 247 Ga. 802, 805 (2) (280 SE2d 338) (1981) (when a contract is severable, even an invalid portion would not render the other provisions of the contract void).

*Lipshutz, Greenblatt & King, Randall M. Lipshutz, James V. Zito*, for appellees.