A94A0151. McLEAN v. CONTINENTAL WINGATE COMPANY, INC. et al.
(442 SE2d 276)

BLACKBURN, Judge.

The appellant, John McLean, Jr., filed the instant action for damages based on an alleged breach of an employment contract against Continental Wingate Company, Inc., five other affiliated companies, Continental Wingate Company of Georgia, Continental Wingate Associates, Wingate Management Company, Wingate Development Company, Continental Wingate Capital Corporation, and Gerald Schuster, the president of the parent company, Continental Wingate Company, Inc. The appellees, hereinafter referred to as Continental Wingate, collectively responded, asserting several defenses and a counterclaim.

Following the commencement of discovery, the appellees moved for summary judgment, maintaining that the purported employment contract was vague and uncertain, and the amount of any earned profits due was within the discretion of Continental Wingate's director. Schuster further moved for summary judgment on the grounds that the "alter ego" theory asserted by McLean in his responsive pleadings was inapplicable to him. The motion was granted by the trial court and this appeal followed.[1]

Construed in the light most favorable to McLean, the non-movant, the record shows that Continental Wingate is in the business of

---

[1] In its June 14, 1993 order granting the motion for summary judgment, the trial court denied Continental Wingate Capital Corporation's motion to dismiss based upon lack of jurisdiction. The corporation did not appeal the trial court's decision on this issue.

developing and syndicating various real estate projects. McLean had been employed with Continental Wingate since 1979, as vice president of Continental Wingate Company of Georgia, and later as director of the parent corporation, and during this time, Continental Wingate and McLean executed several written agreements memorializing the nature of their employment relationship. Two prior agreements provided that McLean would receive a salary in addition to a percentage of the profits of the company. In calculating the profits pursuant to those agreements, Continental Wingate ascertained the fees generated from investors and deducted the cost of syndicating the venture, but did not deduct the cost of the operation of or construction of the projects.

The terms of the agreement at issue are contained in a letter dated November 23, 1984, written by Schuster, and executed by Schuster and McLean. This agreement covered McLean's employment with Continental Wingate commencing January 1, 1985, through December 31, 1989. Under its terms, McLean would receive an annual salary of $75,000, a Cadillac automobile, a one-time payment of $10,000 as a fee from a specific real estate project, in addition to a percentage of profits earned by Continental Wingate. The relevant portion of the letter at issue, specifically paragraph five provided that, McLean "shall receive a percentage of the profits earned by Continental Wingate Company, Inc., or its affiliates from certain additional transactions upon the terms and conditions more specifically set forth below. These sums will be paid to you as the money is received by the company. Specifically, you shall receive an amount equal to 7.5 per cent of the net proceeds earned by Continental Wingate Company of Georgia Inc., or its parent, Continental Wingate Company, Inc, from all transactions in which Continental Wingate Company of Georgia Inc., or its affiliates is the majority participant in the development procedure. . . . You shall also receive 7.5 per cent of the net proceeds earned by Continental Wingate Company of Georgia, Inc., or its parent, Continental Wingate Company, Inc., from future transactions in which Continental Wingate Company of Georgia, Inc, is the major participant in the development process. The net profits due you shall be determined by Continental Wingate Company, Inc., in its sole discretion, as they relate to development proceeds, exclusive of operations."

Under paragraph seven of this agreement, McLean "shall accrue an amount equal to 4 per cent of the net profit earned by Continental Wingate Capital Corporation for those third-party syndications solicited by [him] and closed in conjunction with Continental Wingate Capital Corporation for the purpose of syndication." In exchange for this compensation, McLean agreed to use his best efforts, skills, and abilities to faithfully promote the interest of the companies in over-

seeing the day-to-day operations of the company and its assets, the development of new properties, and the maintenance of relationships necessary to continue business interests in the company. The contract further provided that there would be an annual accounting provided to McLean of the profits earned on future projects.

As of January 1985, McLean had been projected to earn $641,493 based upon Continental Wingate's projected earnings on various real estate projects. This figure included projections through 1990. By December 1988, the profit calculations were re-evaluated by Continental Wingate's treasurer, and as a result, McLean's total earned profits had been reduced to $302,599, based upon Continental Wingate's unilateral decision to deduct working capital advances from the earned profits in calculating the profits due. McLean protested to the use of the working capital in the profit analysis, as such method of calculating profits conflicted with the terms of the employment agreement, and requested that the company recalculate his profits using the January 1985 figures. By December 21, 1989, without replying to McLean's challenge to the calculation method, Continental indicated that McLean had been paid in full inasmuch as he had indisputably received $302,599, in bonus payments. To no avail, McLean demanded the balance of $338,894, which was due based upon his calculations under the method used under the prior agreements. McLean was subsequently terminated. Based upon Continental Wingate's failure to make payment of the remaining sums allegedly due pursuant to the terms of the agreement, this action ensued.

1. Initially, McLean maintains that the trial court erred in determining as a matter of law that the agreement was too vague to be enforceable. We agree.

" 'The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon. (Cit.)' [Cit.]" *Advance Security v. Superior Surgical Mfg. Co.*, 197 Ga. App. 769, 771 (1) (399 SE2d 488) (1990). Any ambiguity in the agreement must be construed strongly against Continental Wingate inasmuch as the company drafted the document. *Gram Corp. v. Wilkinson*, 210 Ga. App. 680 (437 SE2d 341) (1993). Moreover, "it is well-settled that the policy of the law is against the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract was made to determine the reasonable intention of the parties." (Citations and punctuation omitted.) Id. at 681. "The existence or non-existence of ambiguity in a contract is a question of law for the court. [Cits.]" *Jaraysi v. Yates*, 206 Ga. App. 217, 218 (424 SE2d 793) (1992).

In the case sub judice, the contract was sufficient to convey the intentions of the parties concerning McLean's compensation package. While Continental Wingate maintains that the contract is vague and

unenforceable because the agreement did not contain a formula for the calculation of the profits to which McLean was entitled under its terms, "it is not necessary for a contract to state all details of the agreement. . . ." *Southeastern Underwriters v. AFLAC*, 210 Ga. App. 444, 446 (436 SE2d 556) (1993). The contract did not contain a stated formula for the calculations of profits or net proceeds, but the parties, based upon their past dealings, understood the meaning of the term "net proceeds," and the method of establishing the percentage of profits due for his services. We further note that the contract was ratified by Continental Wingate's payment of the prior incentive bonuses pursuant to its terms based upon calculations made without the use of the operating expenses as required by the terms of the contract. Although the company unilaterally attempted to modify the method of calculating the profits in December 1988, " '[i]t is elemental that it is not possible to have a unilateral modification of a contract previously entered into between the parties.' [Cit.]" *American Express Travel Related Svcs. Co. v. Berlye*, 202 Ga. App. 358, 361 (414 SE2d 499) (1991). While the contract provided that the amount of payments due McLean was in the sole discretion of the company, the terms of the agreement specifically excluded the use of operating expenses in the calculation of profits. Since we find no ambiguity in the terms of the contract and a material issue of fact remains as to whether the company breached the contract by its prohibited use of operating expenses in determining the bonus to which McLean was entitled, we must conclude that the trial court erred in granting Continental Wingate's motion for summary judgment on his claim for the balance due under paragraphs five and seven of the contract.

2. Next, McLean maintains that the trial court erred in finding as a matter of law that Schuster could not be held liable for the wrongful acts of the corporations under the alter ego theory. Specifically, McLean maintains that the corporations were totally controlled by Schuster and used by Schuster as a conduit for his personal affairs. To support those assertions, McLean averred in his affidavit that the corporations did not hold annual meetings and did not maintain minute books for inspection. McLean further averred that Schuster used the corporations' assets to purchase personal property, including realty, for himself and for family members, which did not benefit the corporation. Moreover, Schuster did not treat the parent and affiliate companies as separate entities.

"To establish the alter ego doctrine it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud."

(Citations and punctuation omitted.) *Custom Lighting &c. v. Hampshire Co.*, 204 Ga. App. 293, 295-296 (2) (418 SE2d 811) (1992). To refute the averments made in McLean's pleadings and his affidavit, Schuster submitted his affidavit and the affidavit of the treasurer of the parent corporation in which both denied that McLean commingled his personal assets with those of the corporation and denied any distribution to Schuster or his family other than earned salaries. Both further maintained that each corporate entity maintained separate banking accounts and strictly adhered to corporate formalities. The treasurer also averred that the corporations were adequately capitalized and filed separate tax returns.

Based upon the diametrically opposing evidence in the record before us, we believe that a material issue of fact exists for jury resolution on whether Schuster operated the companies as an alter ego and as a subterfuge rather than as distinct business entities. See *B. J. Howard Corp. v. Skinner, Wilson & Strickland*, 172 Ga. App. 180 (2) (322 SE2d 306) (1984). Accordingly, the trial court erred in granting summary judgment in favor of Schuster on McLean's alter ego theory.

*Judgment reversed. Birdsong, P. J., and Cooper, J., concur.*

DECIDED MARCH 9, 1994.

*Griffin, Cochrane & Marshall, John D. Marshall, Jr., Terrence L. Croft*, for appellant.

*Morris, Manning & Martin, Anthony E. Diresta, Marc J. Smith*, for appellees.