### A01A1023. JACKSON v. FORD et al.
(555 SE2d 143)

RUFFIN, Judge.

Alleging breach of contract, fraud, quantum meruit, unjust enrichment, breach of fiduciary duty, and promissory estoppel, Terry Jackson sued his former employers, James Lee Ford, Sr., the Ford Law Firm, and James Lee Ford, P.C. (collectively "Ford"), for damages arising from Ford's failure to pay him bonus compensation. Ford counterclaimed for legal fees allegedly owed by Jackson, breach of professional trust, and conversion. Ford subsequently moved for summary judgment on Jackson's claims, and Jackson filed a cross-motion for summary judgment on Ford's counterclaims. The trial court granted Ford's motion, while denying Jackson's request. Jackson appeals these rulings, and we affirm.

1. In his first enumeration of error, Jackson challenges the trial court's grant of summary judgment to Ford. Summary judgment is appropriate "when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[1] We apply a de novo standard of appellate review and "view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[2]

Viewed in this manner, the evidence shows that in October 1994, Jackson received an offer to work as an associate attorney in Ford's law office. According to Jackson, Ford orally offered him an annual salary of $30,000, plus a bonus or "incentive compensation" of ten to fifteen percent of contingency fees received in cases on which Jackson did "substantive" or "substantial" work. Within the ten to fifteen percent range, Ford had discretion to set the amount of "incentive compensation." Jackson accepted Ford's oral offer and began work the following month.

---

[1] *Dover v. Mathis*, 249 Ga. App. 753 (549 SE2d 541) (2001).
[2] Id.

On March 1, 1995, Ford sent Jackson a memorandum reaffirming the incentive compensation scheme. The memorandum stated that, based upon his performance, Jackson would receive incentive compensation on contingency fee cases in the range of ten to fifteen percent of the fee. The memo further provided:

> the amount of any incentive compensation that you receive is totally a matter of my discretion. For example, if you only do a nominal amount of work on a case which generates a substantial fee, you may not receive 10% of that fee. Either I or [my partner] have the discretion to evaluate the quality of work which you provided, its contribution to the overall result, and to set a fee, based purely on our discretion, which appropriately reflects your input.

Jackson testified that the compensation scheme described in the memorandum comported with the terms of his oral employment contract.

Although Jackson received the $30,000 annual salary, he became dissatisfied with his level of incentive compensation, which, in his view, fell short of the promised ten to fifteen percent range. Eventually, Jackson decided to leave Ford's firm. On November 4, 1996, he wrote Ford, tendering his resignation and outlining his work on pending cases, as well as the incentive compensation he expected to receive for those cases.

Ford responded to Jackson's letter on November 19, 1996, stating that "[a]ny additional compensation you may stand to receive on any case . . . is totally a matter of my discretion" and that "any expectation you have to receive a fixed percentage on any case is totally misplaced." Ford further indicated, "[t]he only agreement you even had with me was that I would consider additional compensation, within certain parameters, as a matter of my absolute discretion." Ford requested that Jackson acknowledge his understanding of the compensation plan by signing the memorandum, and Jackson did so. According to Jackson, however, he signed the memorandum only because Ford screamed obscenities at him and told him to sign it or immediately "get out of [the] office."

After Jackson left Ford's employment, disputes continued over incentive compensation for work Jackson performed before he resigned. Jackson eventually filed suit, and the trial court granted Ford summary judgment on each of Jackson's claims. Jackson now argues that the trial court erred in granting summary judgment on his breach of contract, fraud, quantum meruit, unjust enrichment,

and promissory estoppel claims.[3] We disagree.

(a) *Breach of Contract.* Jackson argues that Ford reneged on his promise to pay him incentive compensation in the range of ten to fifteen percent of attorney fees received from cases on which Jackson worked. This alleged promise forms the basis of his breach of contract claim.

To be enforceable, a promise of future compensation must "be for an exact amount or based upon a 'formula or method for determining the exact amount of the bonus.' "[4] The sum must be "definitely and objectively ascertainable from [the] contract."[5] Jackson asserts that his incentive compensation arose from a formula that set ten percent of fees as the minimum bonus. The record shows, however, that his incentive compensation scheme was only partially based on a formula.

As an initial matter, Ford clearly had discretion to set the bonus compensation within the ten to fifteen percent range. Moreover, that range applied only to cases in which Jackson performed "substantial work." Jackson noted at his deposition that "substantial is . . . subject to some disagreement, but not much." He has pointed to no evidence, however, that the parties ever reached an agreement as to what a "substantial" amount of work might be.

During his deposition, Jackson discussed the type of work that *he* considered substantial or nonsubstantial. He testified, for example, that working "20 to 30 hours in a 600-hour case" or simply researching one issue would not qualify as a substantial contribution to a case. But he offered no objective or formulaic method under the compensation plan for determining when his work rose to the level of "substantial." Furthermore, he has not cited any evidence that Ford agreed with his assessment of when his work became "substantial."

We find that the amount of incentive compensation promised Jackson was not definite or objectively ascertainable from the promise made. Although a partial formula established a range of compensation, payments within that range were discretionary, and the point at which that range became applicable — "substantial work" — was hardly definite. As our Supreme Court has held, "[p]ermitting a bonus to be only partially tied to a formula is not consistent with the rationale for requiring a formula."[6] Thus, Ford's oral promise to pay

---

[3] In his appellate briefs, Jackson does not mention his breach of fiduciary duty claim. Any argument that the trial court improperly granted summary judgment on that claim, therefore, has been abandoned. Court of Appeals Rule 27 (c) (2).

[4] (Citations omitted.) *Arby's, Inc. v. Cooper*, 265 Ga. 240, 241 (454 SE2d 488) (1995). See also *Moore v. BellSouth Mobility*, 243 Ga. App. 674, 676 (1) (534 SE2d 133) (2000) (citing *Arby's*).

[5] *Arby's*, supra.

[6] Id.

Jackson incentive compensation was too indefinite to be a legally enforceable obligation.[7]

Our decision in *McLean v. Continental Wingate Co.*[8] does not require a different result. The employment agreement in *McLean* entitled the claimant to a specific percentage of corporate net profits, which were to be determined by the company " 'in its sole discretion.' "[9] For several years, the company used a particular method for calculating net profits. The company then changed its calculation method, significantly reducing the claimant's compensation.[10] The trial court determined that the agreement was too vague to be enforced. We reversed, finding that although the contract lacked a formula for calculating net profits, "the parties, based on their past dealings, understood the meaning of the term 'net proceeds,' and the method of establishing the percentage of profits due for [the employee's] services."[11]

Jackson has pointed to no similar "past dealings" or understandings that provide certainty to the incentive compensation plan at issue here. Accordingly, the trial court properly granted Ford summary judgment on Jackson's breach of contract claim.[12]

(b) *Fraud.* Jackson argues that Ford defrauded him by promising to pay incentive compensation with the present intention not to perform. "Although fraud can be predicated on a misrepresentation as to a future event where the promisor knows that the future event will not take place, fraud cannot be predicated on a promise which is unenforceable at the time it is made."[13] As discussed above, Ford's promise of incentive compensation was, at all times, too indefinite to be enforced. It follows that the trial court properly granted Ford sum-

---

[7] Id. at 242. See also *Christensen v. Roberds of Atlanta*, 189 Ga. App. 289, 291-292 (2) (375 SE2d 267) (1988) (physical precedent only) (oral promise to pay annual bonus between $7,000 and $8,000 was too indefinite to be legally enforceable); *Mosteller v. Mashburn*, 64 Ga. App. 92, 99 (12 SE2d 142) (1940) (promise to pay claimant $4,000 to $5,000 for unspecified services was unenforceable; "[t]he fact that [the promisor] never at any time promised to pay any definite sum for the performance of any services . . . is itself sufficient to defeat any right in [the claimant] to recover on any promise").

[8] 212 Ga. App. 356 (442 SE2d 276) (1994).

[9] Id. at 357.

[10] Id. at 358.

[11] Id. at 359 (1).

[12] Citing the November 19, 1996 memorandum, which Jackson signed, Ford argues that he had discretion to award *no* bonus compensation on a case, regardless of the amount of work Jackson performed. Although Jackson contends that he signed the November 19, 1996 memorandum under duress, we need not address whether Ford had this greater discretion. As discussed above, even if Ford's discretion applied only within the ten to fifteen percent range in cases on which Jackson did substantial work, the agreement was unenforceable.

[13] (Punctuation omitted.) *Autrey v. UAP/GA AG CHEM*, 230 Ga. App. 767, 769 (1) (a) (497 SE2d 402) (1998). See also *Ikemiya v. Shibamoto America*, 213 Ga. App. 271, 274 (2) (444 SE2d 351) (1994) (promises of employment were unenforceable " 'even absent any fraud at the time of their utterance,' " and thus could not support a claim of fraud).

mary judgment on the fraud claim.[14]

(c) *Promissory Estoppel.* We similarly find no error in the trial court's decision to grant Ford summary judgment on Jackson's promissory estoppel claim. Promissory estoppel "does not apply . . . . to vague, indefinite promises."[15] Under *Arby's*,[16] the promise of incentive compensation in this case must be described as vague and indefinite. The parties' agreement provided insufficient guidance as to the amount of incentive compensation or when the bonus applied. Just as that promise cannot support Jackson's breach of contract allegations, it is too vague and indefinite to sustain his promissory estoppel claim.[17]

(d) *Quantum Meruit and Unjust Enrichment.* The equitable doctrine of quantum meruit prevents a person who benefits from another's services to be unjustly enriched by those services.[18] The provider of the services may recover their reasonable value, "but value is defined in terms of value to the recipient."[19] The unjust enrichment theory is similarly " 'premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received.' "[20]

During the summary judgment proceedings, Jackson informed the trial court that his quantum meruit and unjust enrichment claims were directed toward work he performed for Ford after he left Ford's employment. The record shows that following his resignation, Jackson agreed to continue working with Ford on three cases: Miller, Strickland, and Ackerman.

With respect to Miller and Strickland, the parties initially agreed that, as payment for his continued work, Jackson would receive a specific percentage of any earned contingency fee. Jackson subsequently withdrew from the cases, and Ford sought to reduce the agreed-upon percentage. Ultimately, however, both cases were resolved adversely to Ford's clients on summary judgment. As contingency fee cases, therefore, Miller and Strickland resulted in no attorney fees for Ford.[21]

---

[14] Id. See also *Hodge Residential v. Bankers First Fed. Sav. &c. Assn.*, 199 Ga. App. 474, 476 (2) (a) (405 SE2d 302) (1991) (no genuine issue of material fact as to fraud claim because, inter alia, "there can be no justifiable reliance on a promise which is unenforceable at the time it is made").

[15] *Mooney v. Mooney*, 245 Ga. App. 780, 783 (538 SE2d 864) (2000).

[16] Supra.

[17] See id.; *Voyles v. Sasser*, 221 Ga. App. 305-306 (2) (472 SE2d 80) (1996) (promise concerning vague future acts does not support promissory estoppel claim).

[18] *Nelson & Hill, P.A. v. Wood*, 245 Ga. App. 60, 62 (1) (537 SE2d 670) (2000).

[19] Id. at 62-63 (1).

[20] *Scott v. Mamari Corp.*, 242 Ga. App. 455, 458 (2) (530 SE2d 208) (2000).

[21] See Black's Law Dictionary (7th ed. 1999), p. 315 (defining "contingent fee" as "[a] fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court").

Jackson's services in Miller and Strickland had no value to Ford.[22] Ford recovered no fees, received no benefit, and was not unjustly enriched. Jackson recognized as much in his summary judgment papers, noting that he would drop all claims relating to cases in which Ford recovered no fee. Accordingly, Jackson's quantum meruit and unjust enrichment theories involving the Miller and Strickland cases have no merit.

Jackson's activities on the Ackerman case similarly do not support recovery. After leaving Ford's employment, Jackson agreed to work on the Ackerman case for 15 percent of the contingency fee. Yet, the record shows that Jackson actually received $84,000, one-third of the entire fee. In contrast, Ford, who withdrew from the case before its resolution, received only $3,000 for his participation. Jackson has made no effort to show how Ford was unjustly enriched by Jackson's services in the Ackerman case. Accordingly, the trial court properly granted Ford summary judgment on Jackson's quantum meruit and unjust enrichment claims relating to Ackerman.

2. Jackson also argues that the trial court erred in not granting him summary judgment on Ford's counterclaims. Again, we disagree.

In response to Jackson's suit, Ford alleged three counterclaims. First, he asserted that Jackson owed him a portion of the fee generated in the Ackerman case. Second, he claimed that Jackson breached a duty of loyalty owed him by failing to protect his interest in that fee. Finally, Ford alleged that Jackson converted property belonging to Ford when he left Ford's employment.

(a) Jackson argues that he owes Ford no legal fees because Ford did not work significantly on the Ackerman case and was paid $3,000 for the work he did perform. According to Jackson, therefore, he was entitled to summary judgment on Ford's claims for nonpayment of these fees and breach of duty.[23]

Viewed favorably to Ford,[24] the record shows that attorney Charles Davis associated Ford's law firm in the Ackerman case while Jackson was still an employee. Ford was to be lead trial counsel, and Jackson was responsible for the day-to-day trial preparation work. After Jackson resigned, he agreed to continue working as "the associate" on the case for 15 percent of the fees earned by Ford and Davis. Disputes between Ford and Jackson arose, however, and Jackson informed the client that he intended to withdraw from the case

---

[22] See *Haldi v. Watson*, 240 Ga. App. 801, 802-803 (2) (522 SE2d 696) (1999) (services provided under contingency fee contract in case that produced no recovery have no value).

[23] Jackson did not argue before the trial court that he owed no duty of loyalty to Ford. To the extent Jackson asserts this argument for the first time on appeal, we cannot address it. See *Clark v. Chick-Fil-A*, 214 Ga. App. 758, 759 (1) (449 SE2d 313) (1994).

[24] *Dover*, supra.

because he could no longer work with Ford. Choosing to keep Jackson as counsel, the client instead asked Ford to withdraw. Ford complied, and the case was later settled, producing a $245,000 fee that Jackson, Davis, and another attorney shared. The record shows that Davis subsequently paid Ford $3,000 for work performed on the case.

Ford argues that a question of fact remains as to whether he was properly compensated for his participation in the case from the time his office became involved until he withdrew as counsel. We agree. Although Jackson claims that he conducted all of the case work, the evidence shows that he engaged in part of that work while employed by Ford. After resigning from Ford's employment, Jackson also agreed to continue working as an "associate" on the case for a percentage of Ford's fee. Furthermore, Ford testified that he worked on various aspects of the case. Given this evidence, a jury could conclude that Ford originally participated in the fee arrangement, served as lead trial counsel on the case for a period of time, and was entitled to recover from the contingency fee the reasonable value of his services.[25]

Jackson also contends that, even if Ford had some claim for fees in Ackerman, he released those claims through accord and satisfaction when he accepted the $3,000 payment from Davis. Accord and satisfaction is an affirmative defense, requiring Jackson to establish a prima facie case on summary judgment.[26] We have defined accord and satisfaction as " 'an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions on this account.' "[27] Whether the parties intended a payment to constitute accord and satisfaction is ordinarily a jury question.[28]

Jackson has not pointed to any credible evidence of an accord and satisfaction agreement. Although Jackson's deposition contains some hearsay testimony about what Ford and Davis discussed when the money was exchanged, he presented no admissible evidence that all parties intended the $3,000 payment to be a final and full satisfaction of Ford's claims.[29] The evidence further shows that Jackson

---

[25] Jackson vaguely asserts that Ford should have sued the client for the value of his services in this case. As part of his counterclaim, however, Ford alleged that he had an implied contract right to a portion of the contingency fee. Jackson has cited no authority that would preclude such a claim. We also note that Jackson apparently believed Ford was entitled to some portion of the fee. As Jackson testified, he and Davis agreed that they "had to pay [Ford] for the time [Jackson] had worked [on the case] when [he] was at [Ford's] firm."

[26] *Rabenstein v. Cannizzo*, 244 Ga. App. 107, 109 (534 SE2d 847) (2000).

[27] *Sawyer v. C & S Nat. Bank*, 164 Ga. App. 177, 179 (1) (a) (296 SE2d 134) (1982).

[28] *Feely v. First American Bank &c.*, 206 Ga. App. 53, 56-57 (2) (b) (424 SE2d 345) (1992).

[29] See *Barich v. Cracker Barrel &c.*, 244 Ga. App. 550, 551 (1) (536 SE2d 221) (2000) (inadmissible hearsay cannot be considered on summary judgment).

never obtained a release or other agreement from Ford that Ford would make no additional claim for fees. Finally, Ford testified that the payment did not constitute an accord and satisfaction.

Given the dearth of evidence regarding an agreement, we cannot find that Jackson produced sufficient evidence of accord and satisfaction to warrant summary judgment.[30] Accordingly, the trial court properly denied his summary judgment motion as to this defense.[31]

(b) We also find no error in the trial court's refusal to grant Jackson summary judgment on Ford's conversion claim. "Conversion is the unauthorized assumption and exercise of the right of ownership over personal property belonging to another."[32] At deposition, Jackson admitted that when he left Ford's employment, he took with him copies of several briefs that he authored, some of which he pulled from his trash can. In addition, he copied onto computer disks various memos and briefs that he had prepared. According to Jackson, he thought these materials might be useful when he opened his own law practice. Ford testified that Jackson had no right to remove any work product from the law firm.

On appeal, Jackson asserts that he took only his own work product, not work product or property belonging to Ford. Ford, on the other hand, contends that the work product belonged to him, even if authored by Jackson. Other than making conclusory statements, neither party has offered any legal argument on whether Ford owned the work product Jackson generated during his employment with Ford. We need not reach the issue of work product ownership, however, because the record contains sufficient evidence to create a question of fact as to whether Jackson converted other property belonging to Ford.

Jackson agreed that Ford paid for the paper on which the briefs he removed from Ford's office were copied. Although Jackson asserted that certain of those papers were "trash," Ford testified that Jackson was not entitled to remove the papers from the office. A triable issue remains, therefore, as to whether Jackson converted these

---

[30] Cf. *Rabenstein*, supra (accord and satisfaction shown by evidence including delivery and acceptance of settlement check stating on its face that it constituted a final settlement of all claims).

[31] Jackson also argues that Ford's decision to accept the $3,000 payment from Davis released him as a matter of law under OCGA § 13-4-80, which provides that "[w]hen a creditor releases another who is bound jointly with or primarily to a debtor . . . a release results by operation of law." Even assuming Ford released Davis from further liability, Jackson's failure to show that Ford accepted the payment as full satisfaction of the claimed debt precludes summary judgment on this basis. See *Groover v. Commercial Bancorp &c.*, 220 Ga. App. 13, 14-15 (1) (a) (467 SE2d 355) (1996) (because release agreement showed payments to one debtor were not in full satisfaction of entire debt, agreement did not operate as a general release of all debtors under OCGA § 13-4-80).

[32] *GLW Intl. Corp. v. Yao*, 243 Ga. App. 38, 42 (3) (b) (532 SE2d 151) (2000).

pieces of paper. Furthermore, a Ford employee testified that Jackson "took some computer disks that had information . . . on different ongoing cases." Jackson asserted that he purchased the computer disks he used to download information from Ford's computer. Nevertheless, the employee's testimony raises a question of fact as to whether Jackson removed computer disks belonging to Ford from the office.

Jackson argues that attorneys should not be subject to this type of claim when they leave a law firm "under less than ideal circumstances." We agree that the alleged conversion of paper and computer disks, if true, would result in only minimal damages. On appeal, however, Jackson has not shown that the trial court erred in denying his motion for summary judgment on Ford's conversion claim.

(c) Finally, in a two-sentence argument, Jackson asserts that the trial court should have granted him summary judgment on Ford's claims for punitive damages and attorney fees. He argues that because Ford's substantive counterclaims lack merit, the attorney fees and punitive damages allegations must fail. As found above, however, the trial court properly denied Jackson's motion for summary judgment on the substantive counterclaims.

In the last sentence of the argument section in his brief, Jackson further claims that his actions do not evidence the type of bad faith, wilfulness, or other conduct necessary for a punitive damages award. Jackson has provided no argument, citation of authority, or record reference to support this assertion. He rests on this single sentence, apparently assuming that it will carry his argument for him. It does not. Because Jackson has failed to support this claim for reversal, it is deemed abandoned.[33]

*Judgment affirmed. Johnson, P. J., and Ellington, J., concur.*

DECIDED OCTOBER 9, 2001 —
RECONSIDERATION DENIED NOVEMBER 6, 2001 — ▮▮▮▮▮▮▮

*Taylor W. Jones & Associates, Taylor W. Jones, Richard E. Harris*, for appellant.
*Morris, Manning & Martin, Warren W. Wills, Jr.*, for appellees.

---

[33] See *Chouinard v. City of East Point*, 248 Ga. App. 768, 772 (3) (546 SE2d 827) (2001); *Brooks v. Meriwether Mem. Hosp. Auth.*, 246 Ga. App. 14, 16 (2) (539 SE2d 518) (2000).