## A04A2281. BOTTERBUSCH v. PREUSSAG INTERNATIONAL STEEL CORPORATION.

### (609 SE2d 141)

RUFFIN, Presiding Judge.

Reiner Botterbusch sued his former employer, Preussag International Steel Corporation ("PISC"), for breach of his employment contract. PISC subsequently moved for summary judgment, and the trial court granted the motion. The trial court also denied Botterbusch's motion for partial summary judgment. Botterbusch appeals both rulings, and for reasons that follow, we affirm in part and reverse in part.

Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law.[1] We review a trial court's summary judgment ruling de novo, construing the evidence and all reasonable inferences in a light most favorable to the nonmovant.[2]

Viewed in this manner, the record shows that PISC, an American subsidiary of a German conglomerate, was incorporated in 1981 under the name Salzgitter International, Inc. ("Salzgitter International"). In 1989, Salzgitter International's parent company merged with another entity, and Salzgitter International changed its name to Preussag International, Inc., which later became Preussag International Steel Corporation.

The record further shows that, when PISC (then known as Salzgitter International) was incorporated, Botterbusch immediately became the company's president and chief executive officer, as well as a member of its board of directors. Nevertheless, he did not enter a written employment agreement with the company until January 1, 1986. The agreement, which designated Botterbusch as the company's president and CEO, established a 36-month employment term that would be automatically renewed for "additional and successive periods of thirty-six (36) months each . . . until [Botterbusch's] employment is terminated as herein provided."

On December 16, 1985, Salzgitter Stahl GmbH ("STH"), which apparently owned PISC,[3] sent this agreement to Botterbusch for his signature. A cover letter accompanied the agreement and detailed certain aspects of Botterbusch's employment. Through the letter, STH also "confirm[ed] to [Botterbusch] [its] promise to carry an old-age pension plan in accordance with the guidelines of the Essener

---

[1] See *Razavi v. Shackelford*, 260 Ga. App. 603 (580 SE2d 253) (2003).

[2] See id.

[3] In his deposition, Botterbusch was not entirely clear regarding the corporate structure of the German conglomerate and its various holdings.

Verband," a German pension fund.

Botterbusch operated under the 1986 employment agreement until it was amended on February 15, 1994. The amended agreement established an employment term of sixty months, or five years, from January 1, 1995. The amendment further provided that if this term was not otherwise terminated, it would "be extended thereafter automatically for an additional period to expire at such time as [Botterbusch] reaches 65 years of age, . . . at which time [Botterbusch's] employment shall be terminated." All provisions of the original employment agreement that were not modified by the amended agreement remained in effect.

On August 25, 1998, during the 60-month employment term established by the amended employment agreement, PISC informed Botterbusch by letter that it had terminated his employment without cause and had dismissed him from the board of directors. Although Botterbusch's employment agreement authorized a termination without cause "upon written notice given not less than two hundred seventy (270) days prior to such termination," PISC did not afford him this notice period. Rather, it indicated that his termination was effective immediately and instructed him not to return to the PISC offices. Through the letter, however, PISC promised to fully compensate Botterbusch during the 270-day notice period and, as required under the employment agreement, pay him for the remainder of his employment term plus 12 months thereafter. It appears that PISC made these payments to Botterbusch.

Botterbusch subsequently sued PISC for breach of contract, asserting two claims. In his complaint, he first argues that his August 25, 1998 termination was ineffective and that PISC never actually terminated him before his 60-month employment term expired on January 1, 2000. Thus, he contends, his employment automatically renewed for another period that extended through his 65th birthday on July 22, 2003. According to Botterbusch, PISC owes him no less than $1,000,000 in additional compensation. Second, he claims that PISC breached its promise to provide him supplemental retirement benefits equivalent to those he would have received under the Essener Verband.

The trial court rejected Botterbusch's claims, finding that PISC terminated his employment before the employment contract automatically renewed on January 1, 2000. It also concluded that, although PISC did not give Botterbusch the required 270-day termination notice, Botterbusch's damages were limited to compensation he would have received during the notice period, which PISC had already paid. Finally, the trial court determined that Botterbusch was not entitled to the claimed retirement payments. Given these findings, the trial court granted PISC's summary judgment motion

and denied Botterbusch partial summary judgment on his claim that the employment agreement automatically renewed on January 1, 2000.

1. (a) On appeal, Botterbusch first argues that PISC never properly terminated him. Specifically, he argues that his termination violated the corporate bylaws, rendering the termination decision a nullity.

PISC's bylaws empower the board of directors to manage and direct the company's business affairs. Included in those responsibilities is the power to appoint and remove corporate officers from office. The board consists of four directors elected by the corporation's shareholders. At all board meetings, "a majority of directors shall constitute a quorum for the transaction of business, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the board."

Two members of PISC's board of directors purportedly signed Botterbusch's August 25, 1998 termination notice. According to the minutes of PISC's August 25, 1998 board meeting, these same two directors were the only board members present at the meeting that day.[4] Citing this evidence, Botterbusch argues that a quorum of directors was not available to make the termination decision, rendering it invalid.

Pretermitting whether the initial decision-making process suffered from an inadequate quorum, the evidence shows that the PISC board later ratified Botterbusch's termination. And, under Georgia law, the termination of a corporate officer without board authority may be ratified, and thus rendered legal, by a subsequent vote of the board of directors.[5] The record reveals that, on September 2, 1998, the board of directors of PISC's sole shareholder — Preussag North America, Inc. — appointed a new board for PISC. Three of the four newly elected PISC directors were present at the September 2, 1998 meeting. These three directors, as well as Preussag North America, Inc., approved, confirmed, adopted, and ratified Botterbusch's August 25, 1998 termination.

On appeal, Botterbusch argues that PISC's "parent" company could not effectively ratify his termination. But three of the four newly installed PISC board of directors attended the September 2, 1998 meeting, and these three individuals voted to ratify the firing. Botterbusch does not argue that Preussag North America improperly

---

[4] Botterbusch claims that Hartmut Nolte, one of the claimed PISC directors who attended the August 25, 1998 board meeting and signed the termination notice, was not, in fact, a board member at that time. We need not resolve this claim here.

[5] See *McCreery v. RSA Mgmt.*, 249 Ga. 43, 45 (2) (287 SE2d 203) (1982); see also *Martin v. J. M. Clayton Co.*, 184 Ga. App. 273, 273-274 (361 SE2d 385) (1987).

installed or elected the new board. And the record shows that Preussag North America, PISC's sole shareholder, was authorized to remove the prior PISC board and elect new members. Moreover, Peter Seeger, the only newly installed PISC director who did not attend the September 2, 1998 meeting, was one of the former directors who signed the original August 25, 1998 termination notice. Thus, the other three new directors approved the decision previously made by the one PISC director not available at the September 2, 1998 meeting.[6]

Botterbusch further argues that the new PISC directors in attendance at the September 2, 1998 meeting, who also happened to be directors of Preussag North America, actually acted on behalf of Preussag North America when they voted to ratify his termination. To support this claim, he notes that the record contains no minutes of a PISC board meeting memorializing the ratification. He also asserts that Preussag North America directors cannot ratify the actions of the PISC board.

An individual who attended the September 2, 1998 meeting, however, testified that, after their appointment to the PISC board, the three PISC directors voted to ratify Botterbusch's termination. Furthermore, regardless of the various positions they may have held, nothing in the record indicates that these individuals were *not* acting as PISC directors. In fact, after approving Botterbusch's termination, the newly appointed chairman of the PISC board advised the board of Preussag North America who would take over for Botterbusch as president and CEO of PISC.

The record shows that, by September 2, 1998, all four current PISC directors had approved Botterbusch's August 25, 1998 termination. Furthermore, Botterbusch apparently did not return to work at PISC after August 25, 1998, although the company continued to pay him through the end of his contract term plus 12 additional months, as mandated by his employment contract. Under these circumstances, we agree with the trial court that, as a matter of law, PISC terminated Botterbusch before his contract automatically renewed on January 1, 2000. To find otherwise and require PISC to pay him through July 2003 would elevate form over substance, giving Botterbusch an unjust windfall.

(b) Botterbusch also argues that, even if the PISC board of directors ratified his termination, his employment contract still automatically renewed on January 1, 2000, because PISC failed to terminate him pursuant to the requirements in his employment

---

[6] See *McCreery*, supra (other directors ratified termination decision previously made by chairman of the board).

agreement. Under that agreement, Botterbusch's 60-month employment term automatically extended on January 1, 2000, "unless earlier terminated as . . . provided" in the agreement. The agreement permitted termination without cause "upon written notice given not less than two hundred seventy (270) days prior to such termination." Noting that PISC did not afford him this 270-day notice period, Botterbusch claims that PISC never properly terminated him, resulting in automatic renewal on January 1, 2000.

We disagree. PISC's failure to comply with the notice requirement constituted a procedural, rather than substantive, flaw in the termination.[7] And "[a]n employer's failure to follow contract procedures in dismissing an employee does not 'cause' the termination."[8] As explained by our Supreme Court,

> [i]f the employer were justified in terminating the employee under the contract, then the termination would have occurred even if the employer had followed the proper procedures. Thus, procedural flaws in the manner in which the termination was carried out will not warrant damages to compensate for losses that naturally result from a justified termination.[9]

A procedural breach does not void the termination or entitle the employee to recover the full value of his employment contract.[10] On the contrary, we have found that, in cases where an employer terminates an employee in violation of a contractual notice provision, recovery is limited to the actual contractual loss during the notice period.[11]

Applying these principles here, we conclude that PISC's failure to comply with the 270-day notice provision did not void Botterbusch's termination, undermining his claim that the employment contract automatically renewed on January 1, 2000. Undoubtedly, however, PISC procedurally breached the contract by failing to comply with this provision, raising questions as to whether Botterbusch has *some* claim for damages.

---

[7] See *Savannah College of Art & Design v. Nulph*, 265 Ga. 662, 663 (2) (460 SE2d 792) (1995).

[8] Id. at 662 (1).

[9] Id.

[10] See id. at 662-663.

[11] See *Belcher v. Thomson Newspapers*, 190 Ga. App. 466 (379 SE2d 204) (1989); *Mayor & City of Douglasville v. Hildebrand*, 175 Ga. App. 434, 437 (3) (333 SE2d 674) (1985) (physical precedent only).

The trial court found, and Botterbusch does not dispute, that PISC paid him during the 270-day period following his termination. Botterbusch, therefore, suffered no contractual loss from the procedural breach. He nonetheless argues that PISC's breach prevented him from securing subsequent employment before he left PISC. And he claims that, even if he cannot show actual damages, he is entitled to recover nominal damages.

According to Botterbusch, the record contains evidence that, prior to his termination, he was approached by another company that had a job available similar in both scope and salary to his PISC position. This other company, however, ultimately decided not to offer him employment "based, in large part, upon the circumstances of his immediate termination from [PISC]." Botterbusch thus contends that he is entitled to recover from PISC consequential damages relating to this lost opportunity.

"[C]onsequential damages are not recoverable unless they can be traced *solely* to the breach of the contract."[12] In other words, " 'the losses must be directly traceable to the acts of the other party.' "[13] Although Botterbusch presented evidence that his immediate termination impacted "in large part" the other company's decision not to hire him, the circumstances surrounding the termination clearly were not the *sole* factor in that decision. In fact, Botterbusch testified that he discussed possible employment with this company for several months after his termination, but those discussions ended when an individual he knew on the company's executive board "became the object of political attacks . . . and ultimately was pushed out." According to Botterbusch, if this individual had not left the company, he "would have found employment" there. Under these circumstances, Botterbusch cannot show that his immediate termination solely caused this lost opportunity, precluding recovery of the alleged consequential damages.[14]

Nevertheless, "[i]n every case of breach of contract the injured party has a right to damages, [and] if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action."[15] Because PISC paid Botterbusch during the 270-day notice period, he has suffered no actual damages from the breach of the notice provision. But, he is entitled to nominal damages relating to such breach. Accordingly, the trial court erred in granting PISC summary judgment on the nominal damages

[12] (Emphasis supplied.) OCGA § 13-6-8.

[13] *Hixson-Hopkins Autoplex v. Custom Coaches*, 208 Ga. App. 820, 821 (1) (b) (432 SE2d 224) (1993).

[14] See id.; OCGA § 13-6-8.

[15] (Punctuation omitted.) *Belcher*, supra at 467; OCGA § 13-6-6.

portion of this breach of contract claim.[16]

2. Botterbusch also argues that the trial court erred in granting PISC summary judgment on his claim for supplemental retirement benefits. Again, we disagree.

On appeal, Botterbusch first claims that the December 16, 1985 cover letter that accompanied his employment agreement constituted a contemporaneous writing "identifying PISC's obligation to provide a retirement plan." But even if the 1985 letter could be viewed as a contemporaneous writing, the letter was sent by STH — not PISC — and specifically stated that *STH* would "carry" and make contributions to a pension plan for Botterbusch.[17] Furthermore, the letter distinguishes between obligations undertaken by STH and those undertaken by PISC, Botterbusch's employer. For example, it states that STH "will not provide accident and health insurance for [Botterbusch], as [Botterbusch's] employer in Atlanta already provides this." Accordingly, we fail to see how the letter, which sets forth STH's promise to provide retirement benefits, evidences any agreement or intent by PISC to provide Botterbusch with a supplemental retirement plan.[18]

Alternatively, Botterbusch asserts that, even if the promise in the letter is not binding on PISC, agents of PISC orally promised that he would receive a supplemental pension plan. For example, Hans Joachim Selenz, who was responsible for overseeing operations of various companies — including PISC — held by Preussag AG, a German holding company, testified that he discussed Botterbusch's retirement with Michael Frenzel, chairman of Preussag AG's executive board. Based on this discussion, Selenz informed Botterbusch in April 1997 that "[Botterbusch's] retirement benefits would be fixed at seventy percent (70%) of his last base salary and would commence at the conclusion of his employment with [PISC]."

At his deposition, however, Botterbusch admitted that in June 1997, he and Frenzel reached an understanding that his retirement benefits would fall within the range of 60 to 80 percent of his last base salary, with the ultimate percentage to be determined by the chairman of PISC's board of directors. Botterbusch also admitted that,

---

[16] See *Belcher*, supra.

[17] STH is not a party to this lawsuit. It appears, however, that Botterbusch has submitted several claims to STH regarding various payments he believes are due to him under the Essener Verband. He also retains the option of suing STH in Germany.

[18] Cf. *Baker v. Jellibeans, Inc.*, 252 Ga. 458, 459 (1) (314 SE2d 874) (1984) (indicating that contemporaneous written agreements may be used to establish the intent of the parties in entering each of the agreements); *Harris v. Distinctive Builders*, 249 Ga. App. 686, 688 (1) (549 SE2d 496) (2001) ("[T]he circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement.") (punctuation omitted).

based on his agreement with Frenzel, he only expected to receive this retirement benefit if he continued working for PISC until he reached age 65. He never discussed with Frenzel or anyone else what would happen to this benefit if he left the company before he turned 65.

Pretermitting whether Selenz and Frenzel were authorized to bind PISC, the record shows that these alleged oral promises are unenforceable. Although Selenz allegedly promised in April 1997 that Botterbusch would receive a 70 percent retirement benefit beginning when Botterbusch left PISC, even Botterbusch conceded that this was not the final oral agreement reached with Preussag executives. Instead, in June 1997, Botterbusch and Frenzel agreed that Botterbusch would receive between 60 and 80 percent of his last base salary if he remained at the company until age 65, but the final percentage had not yet been determined. Moreover, just weeks before his August 25, 1998 termination, Botterbusch wrote to a Preussag AG executive board member, seeking final resolution of the issues surrounding his retirement package. As Botterbusch stated in his letter:

> After four years of communication without getting any-where, I am asking again that you take a good look at my contributions to the corporation over the past 21 years and then authorize me to shop for a reasonable supplemental retirement package in the United States.

Georgia contract law requires "a meeting of the minds of the parties, and mutuality, and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon."[19] If an agreement's terms are incomplete or incomprehensible, it cannot be enforced.[20]

The evidence shows that, although various parties discussed Botterbusch's supplemental retirement package, no meeting of the minds was reached as to what this package would include.[21] Specifically, Botterbusch has presented no evidence that he and PISC ever agreed regarding the percentage of his base salary that would be paid out as a retirement benefit. In fact, shortly before his termination, he

---

[19] *Razavi*, supra at 604 (1).

[20] See id.

[21] Botterbusch's 1986 employment agreement specifically states that Botterbusch "shall be entitled to share in any employee benefits, including, but not limited to, life, accident, health insurance, and pension benefits provided by [PISC] on the same basis as other employees similarly situated for so long as [PISC] provides or offers such benefits." It is clear, however, that Botterbusch's claim in Count 2 relates to supplemental retirement benefits not included within the terms of his written employment contract. And Botterbusch does not argue on appeal that the quoted language from his 1986 employment agreement provides a basis for his retirement benefits claim.

requested authority to shop for a "reasonable" supplemental package. Under these circumstances, we cannot enforce an alleged oral promise relating to this package.[22]

We further note that, according to Botterbusch's own testimony, the parties only anticipated that supplemental retirement benefits would be available if Botterbusch remained at PISC until the age of 65, a condition that he did not meet. Even assuming, therefore, that the parties reached an enforceable oral agreement regarding the retirement package, Botterbusch admittedly did not meet a condition for obtaining payments under the agreement. Accordingly, the trial court properly granted PISC summary judgment on this claim.

*Judgment affirmed in part and reversed in part. Eldridge and Adams, JJ., concur.*

DECIDED DECEMBER 31, 2004 —

*Raley & Sandifer, G. Brian Raley,* for appellant.

*Seyfarth Shaw LLP, John F. Meyers, Littler Mendelson, John L. Telford, Jr.,* for appellee.

---

[22] See *Razavi*, supra at 604-605; *Jackson v. Ford*, 252 Ga. App. 304, 306-307 (1) (a) (555 SE2d 143) (2001) (oral promise to pay employee ten to fifteen percent of revenues, with the actual percentage to be left to the employer's discretion, was too indefinite to be enforced).