**SECOND DIVISION**
**MERCIER, C. J.,**
**MILLER, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 5, 2024**

# In the Court of Appeals of Georgia

A23A1589. FERGUSON et al. v. KENNESTONE HOSPITAL, INC.

MERCIER, Chief Judge.

Maxine Ferguson, individually and as administrator of the estate of her husband, Barrington A. Ferguson, Sr., filed a pro se medical malpractice action against Kennestone Hospital, Inc. Kennestone filed a motion to dismiss, or, in the alternative, a motion for summary judgment, pointing to Maxine's failure to include a professional affidavit to support her lawsuit and Barrington's consent to the medical procedure at issue. The trial court granted the motion. Maxine filed this pro se appeal, arguing that the trial court erred by dismissing the negligence, promissory estoppel and pain and suffering claims, and by granting summary judgment on the battery claim. Furthermore, Maxine argues that the trial court erred by "ruling on [Kennestone's]

Supplemental Motion less than 30 days after it was filed without giving [her] notice and an opportunity to be heard." For the reasons that follow we affirm the trial court on the grant of the motion to dismiss, but we reverse its grant of summary judgment on the battery claim.

We review de novo a trial court's ruling on both a motion to dismiss for failure to state a claim and a motion for summary judgment. See *Estate of Shannon v. Ahmed*, 304 Ga. App. 380, 380 (696 SE2d 408) (2010); *Ham v. Ham*, 257 Ga. App. 415, 416 (571 SE2d 441) (2002). We review the pleadings in the light most favorable to the plaintiff with any doubts resolved in her favor. *Estate of Shannon*, 304 Ga. App. at 380.

So viewed, the pleadings show that, on November 5, 2017, Barrington was taken to Kennestone via ambulance due to a severe injury to one of his toes, that required the toe to be amputated. Over the following days, "hospital staff changed his antibiotic from Vancomycin to Cefepime," and Barrington subsequently experienced a rapid decline in his condition. His family complained to a nurse, but he remained on the medicine.

On November 13, 2017, Kennestone called Maxine to inform her that Barrington was verbally nonresponsive, and, shortly thereafter, he became comatose

and was moved to the intensive care unit. Maxine "questioned staff as to why [Barrington] was still being treated with Cefepime [but] [n]o one ever gave [Maxine] any clear response." The following day a physician called Maxine and told her that he was going to treat Barrington "with dialysis, which would remove all of the medication from [Barrington's] body. . . . [D]ue to [Barrington's] condition [the doctor] had been studying how to reverse the effects of Cefepime toxicity and [the doctor] was confident that this would be the best course of action."

Following 24 hours of dialysis, Barrington "awoke from his coma" and was transferred out of the ICU. On November 16, 2017, Barrington was "in excruciating pain" and "begged for pain relief." A nurse told Maxine that Barrington would be taken for more dialysis, but, later that evening, Barrington was taken back to the ICU because it was determined that he was too weak for dialysis. Maxine learned that Barrington was "being treated with an anticonvulsant medication called Keppra; [Barrington] had never suffered from seizures." She again questioned "why this medication was given [but] there was no explanation offered by nurses."

On November 20, 2017, Barrington was transferred out of the ICU, but he was "so weak that he could barely speak." On November 23, 2017, "the family decided

to request that the hospital stop the use of Keppra - - despite doctor's opposition." Further, Maxine was later reprimanded by a physician "for ceasing the use of Keppra. [But Maxine] adamantly explained that regardless of what he said, there would be no more use of Keppra on [Barrington]"

On November 24, 2017, Keppra was discontinued, and Barrington's condition improved. Barrington's feeding tube was removed on November 27, 2017. "That day, a physician explained to [Maxine and Barrington] that he recommended two more days of treatment with antibiotic before being released from the hospital. [Maxine] requested to transfer her husband to another hospital, but the doctor assured [Maxine] that if he stayed just two more days for antibiotic treatment, he could go home." Barrington expressed that he wanted to leave the hospital.

> At that time the doctor walked [Maxine] out the door . . . and adjured [Maxine] to allow her husband to stay for two additional days, that he would see to it that [Barrington] was only given antibiotic and that he would be discharged on . . . November 29, 2017. [Maxine] agreed under the condition that her [sic] only be given antibiotics – the doctor promised that would be the case and that [Barrington] would be released on . . . November 29, 2017.

On November 28, 2017, Kennestone called Maxine to tell her that Barrington "had been taken to surgery and during the surgery he stopped breathing while under general anesthesia." Kennestone resuscitated Barrington, and he was taken to the ICU. On November 29, 2017, Barrington was pronounced dead. Maxine observed Keppra being administered to Barrington on the day he passed.

Maxine was appointed administrator of Barrington's estate on January 8, 2020, and filed this complaint on January 7, 2022, alleging negligence, battery, promissory estoppel, and pain and suffering. Kennestone moved to dismiss, or in the alternative, moved for summary judgment on February 22, 2022. On April 6, 2022, Kennestone filed a supplemental motion to dismiss or in the alternative motion for summary judgment. On May 6, 2022, the trial court entered an order dismissing the negligence, promissory estoppel and pain and suffering claims, and granting summary judgment on the battery claim.

1. Maxine argues that the trial court erred by ruling on Kennestone's supplemental motion to dismiss or, in the alternative, motion for summary judgment prior to the expiration of her response deadline. Specifically, she claims that she had 33 days to file a response brief to Kennestone's supplemental brief pursuant to OCGA

§ 9-11-6 (e)[1]; and that the 33 days had not yet expired at the time of the trial court's ruling. See also Uniform Superior Court Rule 6.2.[2]

Kennestone served the motion via mail, so Maxine had 33 days from the date that Kennestone served the motion to file a response, pursuant to OCGA § 9-11-6 (e) and USCR 6.2. Kennestone served the motion on February 22, 2022, and as such, Maxine had until March 28, 2022, to file a response. She failed to do so.

Maxine's argument that her 33-day period began when Kennestone served its supplemental brief is unavailing. The filing of a supplemental brief does not extend the time to respond to a motion. *Garnett v. Murray*, 281 Ga. 506, 507 (1) (639 SE2d 475) (2007) (a "supplemental brief [is] not a motion" and does not create additional time to respond to a motion). Instead, the three-page supplemental "motion" was merely a brief in support of the motion. The motion was served 73 days before the trial court

---

[1] "Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper, other than process, upon him or her, and the notice or paper is served upon the party by mail or e-mail, three days shall be added to the prescribed period." OCGA § 9-11-6 (e).

[2] "Unless otherwise ordered by the judge or as provided by law, each party opposing a motion shall serve and file a response, reply memorandum, affidavits, or other responsive material not later than 30 days after service of the motion." USCR 6.2.

issued the order. As such, the trial court did not err in ruling on the motion. See id.; compare *Pyramid Constr. Co. v. Star Mfg. Co.*, 195 Ga. App. 644, 645 (394 SE2d 598) (1990) (where defendant was served with motion for summary judgment via regular mail, the defendant had 33 days to respond to the motion and the trial court's order, issued 32 days after motion was filed, was premature).

2. Maxine argues that the trial court erred by dismissing her medical malpractice claim due to her failure to file an expert affidavit. She argues that the claim is not for professional negligence, but rather for "simple negligence."

"Medical providers owe certain duties of ordinary care to their patients, and a breach of one of those duties is ordinary negligence, not medical malpractice. Medical malpractice exists only where the act or omission by a professional requires the exercise of expert medical judgment." *Southeastern Pain Specialists v. Brown*, 303 Ga. 265, 271 (2) (a) (811 SE2d 360) (2018) (citations and punctuation omitted). OCGA § 9-11-9.1 (a) requires that a plaintiff alleging a medical malpractice claim must file an expert affidavit with their complaint, setting forth "at least one negligent act or omission claimed to exist and the factual basis for each such claim." However, no such requirement exists for an ordinary negligence claim. *Nail v. State*, 301 Ga. App.

7

7, 8 (686 SE2d 483) (2009). "Whether the negligence alleged by a plaintiff is ordinary negligence or professional malpractice is a question of law for the court." *Southeastern Pain Specialists,* 303 Ga. at 270 (2) (a).

The complaint merely provides a heading for a "[s]imple [n]egligence" claim and does not provide any additional information as to alleged acts of negligence by Kennestone. On appeal, Maxine argues that Kennestone acted negligently by failing to adhere to her, and her family's, instructions "to discontinue the anticonvulsant medication." However, "[t]he decision to employ prescription medication or medical devices involves professional assessment of medical risks in light of the physician's knowledge of a patient's particular need and susceptibilities." *Nail*, 301 Ga. App. at 9 (citation and punctuation omitted). The appellant's arguments about the propriety of whether the medication should have been administered fall squarely within the realm of professional malpractice. See *Grady Gen. Hosp. v. King*, 288 Ga. App. 101, 103 (653 SE2d 367) (2007) ("whether the nurse was negligent in administering a particular drug is a question involving professional judgment"); *Williams v. Alvista Healthcare Center*, 283 Ga. App. 613, 616 (1) (a) (642 SE2d 232) (2007) ("the [appellants'] claim for failing to properly administer [the decedent's] medication is

8

a claim of professional negligence"); see also *Ambrose v. Saint Joseph's Hosp. of Atlanta*, 325 Ga. App. 557, 559 (1) (754 SE2d 135) (2014) ( "[I]f a claim of negligence goes to the propriety of a professional decision rather than to the efficacy of conduct in the carrying out of a decision previously made, the claim sounds in professional malpractice.") (citation and punctuation omitted). Compare *Dent v. Mem. Hosp. of Adel*, 270 Ga. 316, 318 (509 SE2d 908) (1998) (ordinary negligence claim when nurses allegedly failed to activate the alarm on the apnea monitor as the doctor had ordered); *Ambrose*, 325 Ga. App. at 559 (1) (plaintiff stated a claim for ordinary negligence where a surgical microscope burned the plaintiff's back during surgery and he argued that the hospital provided unsafe equipment for use in treating him). Therefore, we hold that the trial court correctly dismissed this claim, and Maxine's related pain and suffering claim, based on her failure to comply with OCGA § 9-11-9.1. See *Williams*, 283 Ga. App. at 616 (1) (a).

3. Maxine argues that the trial court erred by dismissing her promissory estoppel claim. In her complaint she alleges that she "relied on the promise from the doctor to only provide antibiotic along with [Barrington]'s regular medications to [Barrington] and to not do anything else as to medically." Setting aside whether a

9

promissory estoppel can proceed regarding a "promise" a healthcare professional made regarding medical treatment, the "promise" at issue is too vague to be enforceable.

OCGA § 13-3-44 (a), regarding promissory estoppel, provides relevantly that: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." "The threshold requirement for a promissory estoppel claim is that there be some enforceable promise by the defendant." *Woodstone Townhouses v. Southern Fiber Worx*, 358 Ga. App. 516, 531 (4) (a) (855 SE2d 719) (2021). As such, "[p]romissory estoppel does not . . . apply to vague or indefinite promises, or promises of uncertain duration." *Georgia Investments Intl. v. Branch Banking and Trust Co.*, 305 Ga. App. 673, 675 (1) (700 SE2d 662) (2010).

Here the "promise" to "only provide antibiotic along with [Barrington's] regular medications to [Barrington] and to not do anything else as to medically" was too vague to support a promissory estoppel claim. There is no way to know what was meant by the promise "to not do anything else as to medically," let alone any way to

enforce such a statement. See *Underwood v. Colony Bank*, 362 Ga. App. 548, 556 (2) (869 SE2d 535) (2022) ("[defendant's] assurance that [plaintiff] would have 'more time to pay' was too vague and indefinite to be an enforceable promise."); *Jackson v. Ford*, 252 Ga. App. 304, 308 (1) (c) (555 SE2d 143) (2001) (lawyer's claim for promissory estoppel failed because his former employer's promise to pay him incentive compensation in the range of 10 to 15 percent of attorney fees received from cases on which he did "substantive" or "substantial" work was too vague). As such, the trial court did not err in dismissing the promissory estoppel claim.

4. Finally, Maxine argues that the trial court erred by granting summary judgment to Kennestone on the battery claim. Maxine claims that Kennestone performed surgery on Barrington without consent and forged his signature.

"As a general rule, no tort is committed against a person who consents to medical treatment unless that consent is not freely obtained or is obtained by fraud."*Long v. Natarajan*, 291 Ga. App. 814, 816 (2) (a) (662 SE2d 876) (2008) (citation and punctuation omitted); see OCGA § 31-9-6 (d).[3] "A claim for battery

---

[3] "A consent to surgical or medical treatment which discloses in general terms the treatment or course of treatment in connection with which it is given and which is duly evidenced in writing and signed by the patient or other person or persons authorized to consent pursuant to the terms of this chapter shall be conclusively

11

arises from any unauthorized and unprivileged contact by a doctor with his patient in examination, treatment or surgery." *Bowling v. Foster*, 254 Ga. App. 374, 379 (1) (a) (562 SE2d 776) (2002) (citation and punctuation omitted).

In her verified complaint, Maxine stated: "[a]fter reviewing the medical record, [she] noticed that the permission document which the hospital has in it [sic] file was not signed by [her] husband, the signature on the document is not his, Barrington A. Ferguson, Sr., but was and is a forged signature[.]" In defense of Maxine's claim that the signature was a forgery, Kennestone points to a signed consent form in Barrington's medical records.

Here, Maxine has pointed to evidence that Barrington's signature was a forgery. See *Bd. of Regents of the Univ. System of Ga. v. One Sixty Over Ninety, LLC*, 351 Ga. App. 133, 134 (n. 1) (830 SE2d 503) (2019) ("A verified complaint serves as both pleading and evidence.") (citation and punctuation omitted). "A witness can give lay opinion testimony identifying handwriting if the witness knows the handwriting or is so familiar with it that he or she would recognize it." *Ham*, 257 Ga. App. at 417. Due to their relationship, Maxine could give testimony regarding her husband's

---

presumed to be a valid consent in the absence of fraudulent misrepresentations of material facts in obtaining the same." OCGA § 31-9-6 (d).

handwriting. See id. This testimony is sufficient to raise a question of material fact regarding the validity of Barrington's consent and whether his signature was forged. As such, Kennestone did not establish as a matter of law that it was entitled to judgement on the battery claim. See id. (trial court erred in granting summary judgment where wife testified that she believed her husband's signature on a release was a forgery); see also *Lloyd v. Kramer*, 233 Ga. App. 372, 375 (1) (503 SE2d 632) (1998) ("In light of the inconsistencies between the testimony of [the patient and doctor] regarding alleged misrepresentations relating to [the patient's] consent, [the doctor] did not establish as a matter of law that he was entitled to judgment on the battery claim.").

*Judgment affirmed in part, reversed in part. Miller, P. J., and Hodges, J., concur.*